UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
RONALD LICKTEIG,                                    :
                                                    :
                                    Plaintiff,      :
                                                    :
                    -against-                       :
                                                    :
CERBERUS CAPITAL MANAGEMENT, L.P.,                  :
COVIS PHARMACEUTICALS, INC., COVIS                  :
MANAGEMENT INVESTORS LLC, COVIS                     :
HOLDINGS, L.P., and DEAN MITCHELL,                  :
                                                    :
                                    Defendants.     :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/26/2020

1:19-cv-5263-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

When Plaintiff Ronald Lickteig resigned from his position with Defendant Covis

Pharmaceuticals Inc., Lickteig's employment contract required Defendants to purchase equity that

Lickteig had accrued in the firm.  For the purpose of determining the value of Lickteig's equity

interest, Defendants valued the company at approximately $450 million.  Less than eight months

later, however, Defendants sold the firm's assets for $1.2 billion.  Nearly five years after he left the

firm, Lickteig sued Defendants.  Lickteig alleges that Defendants induced him to accept less for his

equity than it was worth by making false or misleading statements about the firm's value.

Because Lickteig has adequately alleged that two of Defendants' statements were false or

misleading, Defendants' motion to dismiss for failure to state a claim is DENIED in part.  However,

the motion is also GRANTED in part as to Defendants' other statements.  And because the Court

does not have personal jurisdiction over Defendant Dean Mitchell pursuant to a forum-selection

clause in a contract that Mitchell did not sign, Defendants' motion to dismiss for lack of personal

jurisdiction as to Mitchell is also GRANTED.

## I. BACKGROUND

### A. Facts[1]

#### 1. Lickteig Joins Covis

Cerberus Capital Management, L.P. ("Cerberus") created Covis Holdings, L.P. ("Covis Holdings") in 2011 to acquire the rights to certain pharmaceutical products from GlaxoSmithKline ("GSK"). Compl. ¶ 22.[2] Lickteig had previously served as national accounts director at GSK. *Id.* ¶ 24. Cerberus and Covis Holdings offered Lickteig a job as "General Manager, Acute Care" at Covis Pharma. *Id.* In December 2011, Lickteig entered into a contribution agreement (the "Contribution Agreement"), under which he contributed intellectual property rights to Covis S.á.r.l. *Id.* ¶ 25; *see* Contribution Agreement, Ex. A to Declaration of Brandon M. Fierro ("Fierro Decl."), Dkt No. 38-1. In exchange, Covis Management issued Lickteig profit interests equal to 200,000 Class B Partnership Interests in Covis Management (the "Profit Interests"). Additional Profit Interest Terms and Conditions ("Additional Terms"), Ex. A to Contribution Agreement at 1, § 1; *see also* Compl. ¶ 25. "These Profit Interests were intended to enable Lickteig to participate in the increase in value of Covis Holdings (and, indirectly, in Covis S.á.r.l.), and represented two percent of the fully diluted equity interests in Covis Holdings." Compl. ¶ 25.

In the Contribution Agreement, Lickteig had an option to require Covis Management to purchase all of his vested Profit Interests at their "Fair Market Value" as of Lickteig's termination date (the "Put Option"). Additional Terms at 4, § 4(a); *see also* Compl. ¶¶ 26, 29. "'Fair Market Value' was defined in Covis Management's Amended and Restated Limited Liability Company

---

[1] The facts are drawn from Plaintiff's Complaint ("Compl."), Dkt No. 1, and are accepted as true for the purposes of this motion to dismiss. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] After Cerberus, via Covis Holdings, acquired these products from GSK, "the commercial rights" to those products were to be "held by non-party Covis S.á.r.l., "an indirect wholly owned subsidiary of Covis Holdings." *Id.* Covis Pharmaceuticals Inc. ("Covis Pharma") is a "wholly owned subsidiary" of Covis Holdings which was intended to "distribute those products in the United States." *Id.* Cerberus also formed Covis Management Investors LLC ("Covis Management") to "issue membership interests" in other Covis entities to other parties. *Id.* Collectively, this opinion refers to Covis Holdings, Covis Pharma, Covis S.á.r.l, and Covis Management as the "Covis Enterprise."

Agreement to mean 'the fair market value of such Profits Interest, asset or liability, as determined in good faith by the Board of Managers, taking into account all relevant factors, including without limitation the most recent valuation, prior to such determination, of the Company and/or its equity interests." *Id.* ¶ 29. The Contribution Agreement defined Lickteig as the "Contributor" and Covis Management as the "MIP Limited Partner." Contribution Agreement at 1.

The Contribution Agreement contained a mechanism for Lickteig to dispute the Board of Managers' calculation of the Fair Market Value of his shares. After Lickteig notified Covis Management of his intent to exercise the Put Option (the "Put Notice"), Covis Management would "determine the Fair Market Value of the Lickteig Profit Interests to be purchased . . . pursuant to Contributor's exercise of the Put Option[.]" Additional Terms at 4, § 4(b). Lickteig was then

> entitled to dispute in good faith the MIP Limited Partner's determination of Fair Market Value by delivering written notice to the MIP Limited Partner within ten (10) business days of its receipt of the Put Notice setting forth in reasonably specific detail the good faith basis of the dispute, including (i) the value that Contributor reasonably believes should be ascribed to the Subject Lickteig Profits Interests and (ii) all facts and figures that Contributor reasonably believes supports Contributor's view of the relevant valuation[.]

*Id.* If Lickteig failed to dispute Covis Management's calculation within ten days, then the Fair Market Value was "conclusively deemed to be equal to the Fair Market Value established by the MIP Limited Partner[.]" *Id.* In other words, if Lickteig failed to dispute the calculation of fair market value, Covis Management's calculation—which was to be calculated in good faith and taking into account all relevant factors—was presumed correct. However,

> [i]f Contributor delivers a Dispute Notice on a timely basis and the MIP Limited Partner and Contributor are unable to reach agreement on the Fair Market Value within twenty (20) business days after the delivery of the Dispute Notice, then each of the MIP Limited Partner and Contributor shall select an independent third-party appraiser, which two appraisers shall select a third independent appraiser, and this third appraiser shall prepare and deliver to the MIP Limited Partner and Contributor a Fair Market Value determination within twenty (20) days after such selection. Such appraisal shall be binding upon the MIP Limited Partner and Contributor.

*Id.*  Hence, the Contribution Agreement set out a process by which disputes over the value of Lickteig's Profit Interests would be settled.

### 2. Lickteig's Resignation and the Valuation

Lickteig voluntarily resigned on June 6, 2014 and exercised the Put Option three days later. Compl. ¶ 28.  At that time, Lickteig held 95,000 vested Profit Interests.  *Id.*  In July 2014, Defendant Dean Mitchell—chairman of the board of Covis S.á.r.l. and "acting on behalf of the other Defendants"—"provided a written valuation to Lickteig . . . which purported to value Lickteig's Profit Interests at $1.1 million (the 'Valuation')."  *Id.* ¶¶ 17, 30.  The complaint contains a picture of the Valuation that Mitchell allegedly provided to Lickteig, which is reproduced below.



**Ron Lickteig**
$ in MM, unless otherwise noted

| | | |
|---|---|---|
| **2013 Adjusted EBITDA** | $ | 62.2 |
| TEV/EBITDA Multiple | | 7.5x |
| **TEV** | $ | **466.7** |
| *Memo: 2014 Adjusted EBITDA* | $ | 68.5 |
| *Memo: Implied 2014 EBITDA Multiple* | | 6.8x |
| Net Debt as of 3/31/2014 | $ | 139.5 |
| Class A Preferred as of 3/31/14 | | 138.4 |
| **Total Common Equity (control, marketable)** | $ | **188.8** |
| Non-marketable / Non-control Discount | | 15.0% |
| **Common Equity** | $ | **160.5** |
| **Ron Lickteig's Interests** | | |
| Ron's Vested Interests | | 95,000 |
| Total Interests | | 13,585,714 |
| % of Total Common Interests | | 0.699% |
| **Ron Lickteig's Interests ($ in MM)** | $ | **1.1** |

**Ron's Vesting Schedule:**

| Date | Vested % | Vested Amount |
|---|---|---|
| 12/23/2011 | 90.000% | 90,000 |
| 12/23/2012 | 92.500% | 92,500 |
| 12/23/2013 | 95.000% | 95,000 |
| 12/23/2014 | 97.500% | 97,500 |
| 12/23/2015 | 100.000% | 100,000 |

The Valuation stated the "total enterprise value ('TEV') of Covis Holdings as $466.7 million."  *Id.* ¶ 31.  Mitchell calculated this TEV by "multipl[ying] Covis Holding's purported '2013

4

Adjusted EBITDA'" [3]—which the Valuation stated was $62.2 million—by a "'TEV/EBITDA Multiple' of 7.5." *Id.*  The 2013 Adjusted EBITDA and the TEV/EBITDA Multiple were the only figures that factored into the Valuation.  Thus, the Valuation was based entirely on 2013 data.

Mitchell also divided this TEV by Covis Holdings' "'2014 Adjusted EBITDA'—which he represented was $68.5 million"—to calculate an "'implied 2014 EBITDA Multiple' of 6.8." *Id.* (brackets omitted).  "Mitchell then subtracted Covis Holding's net debt as well as the value of its Class A preferred shares as of March 31, 2014 to arrive at a total common equity amount of $188,800,000." *Id.* ¶ 32.  After Mitchel subsequently "applied a 15 percent marketability discount and multiplied that amount by Lickteig's total ownership percentage in Covis Holdings," he arrived at the $1.1 million valuation for Lickteig's Profit Interests. *Id.*  On July 22, 2014, Lickteig agreed in principal sell his Profit Interests for $1.3 million. *Id.* ¶ 34.

### 3. The Separation Agreement

The parties' executed the Separation and General Release Agreement (the "Separation Agreement") on August 11, 2014. *Id.* ¶ 35.  The Separation Agreement was executed by Lickteig; Mike Kelly, the CEO of Covis Pharma on behalf of Covis Pharma; and Alexander Benjamin as "authorized signatory" on behalf of Covis Holdings.  Separation Agreement, Ex. F to Declaration of Joseph Matteo ("Matteo Decl."), Dkt No. 38-6, at 7.  Section 4 of the Separation Agreement provided that the $1.3 million payment "represents full consideration for any and all vested profits interests to which Employee was entitled pursuant to the Contribution Agreement, and that the payment set forth in this Section 4 satisfies any obligations the Company owes to Employee pursuant to the Contribution Agreement . . . including any Claims for unvested profits interests pursuant to Section 4(h) of the Contribution Agreement." *Id.* at 2-3, § 4.  Section 4 also stated that Lickteig was "not otherwise entitled to receive the consideration set forth" in that section unless he

---

[3] EBITDA stands for "Earnings Before Interest, Tax, Depreciation, and Amortization."

agreed to release claims against Covis Pharm and Covis Holdings. *Id.* at 3. Section 14 of the Separation Agreement likewise stated that Lickteig "shall not be entitled to the consideration set forth in Section 4 of this Separation Agreement" if he did not return a signed Separation Agreement by August 22, 2014. *Id.* at 6, § 14(A).

Section 2 of the Separation Agreement also provided that Lickteig waived all of his claims against Covis Holdings, Covis Pharma, and their respective affiliates, including claims under the "laws, statutes, and/or regulations of the States of North Carolina, Iowa, or any other state and the United States." *Id.* at 1-2, § 2. The release provision provided a non-exhaustive list of statutes from which Lickteig released the Covis entities, which did not include the Securities Exchange Act of 1934. *Id.* at 2, § 2. The release provision excluded "[c]laims that, by law, cannot be waived." *Id.*

"The Contribution Agreement provided that Covis Management (which had issued the Profit Interests to Lickteig) would purchase those interests upon Lickteig's exercise of his Put Option." Compl. ¶ 35. However, the Separation Agreement "provided that Covis Holdings itself would pay Lickteig for his Profit Interests." *Id.* Lickteig received payment for his Profit Interests in September 2014. *Id.* ¶ 36.

### 4. Defendants' Allegedly False or Misleading Statements

Lickteig alleges that Defendants' valuation of Covis Holdings was materially misleading in several respects. Lickteig first alleges that "Defendants knew that the estimated 2014 Adjusted EBITDA of $68.5 million that they provided to Lickteig in the Valuation . . . was grossly understated." *Id.* ¶ 38. That was because "a PowerPoint deck prepared for a July 29, 2014 meeting of Covis . . . S.á.r.l.'s board of directors" stated that "Covis Holdings had achieved adjusted EBITDA of $51.8 million in just the first two quarters of 2014." *Id.* The presentation noted that this adjusted EBITDA was $18.4 million greater than the 2014 annual plan had anticipated through the first two quarters of 2014; the annual plan had anticipated an adjusted EBITDA of $33.5 million through the first two quarters of 2014. *Id.* The presentation "further noted that the company had

'cash on hand of $63.4mm and total liquidity of $98.4mm inclusive of $35.0mm undrawn revolving.'" *Id.* The presentation listed Mitchell as an attendee and was "prepared in the same month that Mitchell provided the Valuation to Lickteig, and before Defendants finalized their agreement with Lickteig." *Id.* ¶ 39.

The complaint also alleges "on information and belief" that "in June 2014, Defendants valued the pharmaceutical products acquired from GSK at $750 million to $1 billion, which would have implied a far greater TEV than the $466 million provided in the Valuation." *Id.* ¶ 40. And, "[o]n further information and belief, Covis Holdings' actual adjusted EBITDA for 2013 was millions of dollars higher than the $62.2 million reported to Lickteig in the Valuation." *Id.*

Lickteig alleges that "Defendants also misrepresented what they believed to be the appropriate EBITDA multiple for Covis Holdings." *Id.* ¶ 41. Although Defendants used 7.5 as the EBITDA multiple in the Valuation, the complaint alleges that "Mitchell told a colleague in October 2014 that a 'reasonable multiple' for Covis Holdings would be '8-12X' EBITDA." *Id.*

Moreover, the complaint alleges that in addition to affirmatively misrepresenting the value of the Profit Interests, Defendants failed to inform Lickteig of additional material facts. One such allegedly material omission was that Defendants "were actively engaged in discussions to sell Covis Holdings or its pharmaceutical assets for substantially more than the TEV that they provided to Lickteig in the Valuation." *Id.* ¶ 43. One day after Lickteig agreed in principal to sell his Profit Interests but before the parties signed the Separation Agreement, Jim Lenehan, the chairman of the board of directors of Covis Pharma and a Cerberus appointee, wrote to Brett Ingersoll, a Cerberus employee, that "there may be an interesting offer coming quickly." *Id.* ¶ 44. Lenehan also wrote that "hopefully negotiations with former [management] has [sic] concluded." *Id.* ¶ 45 (brackets omitted).

Lickteig further alleges that Defendants concealed that "on information and belief, in July 2014, a potential purchaser valued Covis Holding's assets at $950 million." *Id.* ¶ 47. And the

complaint alleges "[o]n further information and belief" that "Defendants' management prepared a board presentation in July 2014 reporting that two bidders were heavily engaged to purchase Covis Holdings." *Id.* Moreover, "on August 7, 2014, Mitchell sent an internal email entitled 'Acquisition Update' in which he confirmed that Defendants expected an offer 'by the end of this or early next week,' and 'will need to move quickly if the buyer plans to provide a compelling offer.'" *Id.* (brackets omitted).

After the parties executed the Separation Agreement, "Defendants continued to pursue a sale, targeting a valuation of more than $1 billion." *Id.* ¶ 48. On February 12, 2015, Covis Holdings "executed a letter of intent to sell substantially all of its assets to Concordia Healthcare, Inc. ('Concordia')." *Id.* "On March 9, 2015, Defendants publicly announced that Concordia had purchased substantially all of Defendants' assets for $1.2 billion." *Id.*

### B. Procedural History

Lickteig filed the complaint that initiated this case on June 4, 2019. Dkt No. 1. The complaint alleges four claims for relief. First, the complaint asserts a cause of action against all Defendants because they allegedly made false or misleading statements of material fact in violation of section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), ("Section 10(b)") and rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). Compl. ¶¶ 50-56. Second, the complaint asserts a cause of action against Defendants Cerberus and Covis Holdings for control person liability in violation of section 20(a) of the Exchange Act, 15 U.S.C. § 78t, ("Section 20(a)") based on the same false or misleading statements of material fact asserted in the first cause of action. Compl. ¶¶ 57-61. Third, the complaint asserts a cause of action against all Defendants because they made false or misleading statements of material fact in violation of the Iowa Uniform Securities Act, Iowa Code § 502.509(3). Compl. ¶¶ 62-72. Finally, the complaint asserts a cause of action against Defendants Cerberus and Covis Holdings for control person liability in violation of Iowa Code §

502.A7 based on the same false or misleading statements of material fact asserted in the third cause of action.  Compl. ¶¶ 73-77.

Defendants filed their motion to dismiss for failure to state a claim and for lack of personal jurisdiction as to Defendant Mitchell on September 20, 2019.  Dkt Nos. 34-36.  Lickteig subsequently filed an opposition, Dkt No. 37-38, and Defendants filed a reply, Dkt No. 39.

## II. DISCUSSION

### A. Rule 12(b)(6) Motion

#### 1. Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may nonetheless move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679 (citation omitted).  The court must accept all facts alleged in the complaint as true and draw

all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124

(2d Cir. 2008) (per curiam).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  A complaint must therefore contain more than "naked assertions devoid of further factual enhancement."  Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (brackets omitted) (quoting *Iqbal*,

556 U.S. at 678-79).  Thus, a complaint that offers "labels and conclusions" or "naked assertions"

without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678

(brackets omitted) (citing *Twombly*, 550 U.S. at 555, 557).

Securities fraud claims are also subject to the heightened pleading requirements of Federal

Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b)

requires that "in alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy this requirement, the complaint must

"(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3)

state where and when the statements were made, and (4) explain why the statements were

fraudulent."  *ATSI*, 493 F.3d at 99 (citation omitted).  "Allegations that are conclusory or

unsupported by factual assertions are insufficient."  *Id.* (citation omitted).  Furthermore, under the

PSLRA, securities fraud plaintiffs alleging an untrue statement of material fact or an omission of a

material fact necessary to make statements not misleading must specify "each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint shall state

with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  A plaintiff must

therefore "do more than say that the statements . . . were false and misleading; [she] must

demonstrate with specificity why and how that is so."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.

2004).

In determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to "facts stated on the face of the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quotation omitted). However,

> [i]t is well established that a pleading is deemed to include any written instrument that is attached to it as an exhibit or is incorporated in it by reference. And even if the plaintiff chooses not to attach an instrument to the complaint or to incorporate it by reference, if it is one upon which the plaintiff solely relies and which is integral to the complaint, the court may take the document into consideration in deciding the defendant's motion to dismiss.

*Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (citations and alterations omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). "The term written instrument generally refers to a legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Lynch*, 952 F.3d at 79 (quotation omitted). Hence, the "the types of exhibits incorporated within the pleadings by Rule 10(c) . . . consist[] largely of contracts, notes, and other writings on which a party's action or defense is based." *Id.* (quotation and alterations omitted). For a document to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon the documents in framing the complaint.'" *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting *Chambers*, 282 F.3d at 153) (brackets omitted).

The Court has considered the Contribution and Separation Agreements in deciding this motion to dismiss because they are integral to Lickteig's complaint. Both are contracts upon which the Lickteig's claim is based. Moreover, both are cited extensively in the complaint; thus, the Court concludes both that Lickteig had actual notice of the content of both agreements and relied upon them in framing the complaint. The Court has not considered the other documents submitted both in support of and opposition to Defendants motion to dismiss. *See generally* Fierro Decl.; Matteo

Decl.  The Court cannot conclude that any of these documents are integral to the complaint.
Therefore, the Court has not considered them on this motion to dismiss.

### 2. Application

#### a. Statute of Limitations

##### i. Legal Standard

 "The statute of limitations is an affirmative defense as to which Defendants carry the
burden of showing that [Lickteig] failed to plead timely claims."  *DoubleLine Capital LP v. Odebrecht
Fin., Ltd.*, 323 F. Supp. 3d 393, 435 (S.D.N.Y. 2018) (citing *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d
406, 425 (2d Cir. 2008) ("The lapse of a limitations period is an affirmative defense that a defendant
must plead and prove.")).  Accordingly, dismissal of the complaint based on the statute of
limitations at the pleading stage "is warranted only if 'it is clear from the face of the complaint, and
matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter
of law.'"  *Id.* (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

Claims sounding in fraud that are brought under the Securities Exchange Act "must be filed
within the earlier of five years from the alleged violation or two years 'after discovery of the facts
constituting the violation.'"  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018)
(quoting 28 U.S.C. § 1658(b)); *see also* Iowa Code § 502.509(10)(b) (same as to Iowa state law causes
of action).

Defendants' statute of limitations defense turns on when a reasonably diligent plaintiff
would have discovered the fraud alleged in the complaint.  "'When the circumstances would suggest
the probability that a violation of the securities laws has occurred—a situation sometimes called
'storm warnings'—courts deem the plaintiff on inquiry notice and assume that a reasonable person
in his or her shoes would conduct further investigation into the potential violation.'"  *DoubleLine
Capital*, 323 F. Supp. 3d at 436 (quoting *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura
Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017)) (alterations omitted).  The information must be

"'specific enough to provide an ordinary investor with indications of the *probability* (not just the *possibility*) of' a violation." *Fed. Housing Fin. Agency*, 873 F.3d at 120 (quotation omitted).  Before the Supreme Court's decision in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), "such inquiry notice would trigger the running of the statute of limitations." *DoubleLine Capital*, 323 F. Supp. 3d at 436 (citing *Staehr*, 547 F.3d at 426).

In *Merck*, however, the Supreme Court held that "the statute of limitations period does not begin to run until the plaintiff actually learns of the violation or 'a reasonably diligent plaintiff would have discovered the facts constituting the violation, including scienter—irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.'" *Id.* (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011)).  "The point at which inquiry notice is triggered is still relevant." *Id.* (citing *Merck*, 559 U.S. at 653 ("In determining the time at which 'discovery' of [the facts constituting the violation] occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating.")).  "Nonetheless, the clock does not start to tick on the statute of limitations until 'such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation.'" *Id.* (quoting *City of Pontiac*, 637 F.3d at 174).  "A plaintiff is deemed to have discovered the facts constituting the violation only after 'a reasonably diligent plaintiff would have sufficient information to adequately plead its claim in a complaint.'" *Id.* (quoting *Schwab*, 883 F.3d at 94) (alterations omitted).

### ii. Application

Defendants have not met their burden to show that Lickteig's claim is untimely.[4] Defendants argue that the March 2015 sale of the Covis Enterprise's assets to Concordia for $1.2

---

[4] As noted above, the Court has not considered the documents submitted by Defendants in support of their motion to dismiss, except for the Contribution Agreement.  Some of the facts Defendants rely on to argue that Lickteig's claim is untimely are not "clear from the face of the complaint and matters of which the court may take judicial notice" and thus the Court cannot consider them at this stage. *Conopco*, 231 F.3d at 86.

billion was a "storm warning" that would have put a reasonable investor on inquiry notice. However, the Court cannot conclude at the pleading stage that the mere fact that the Covis Enterprise sold its assets for $1.2 billion would have put a reasonable investor on inquiry notice of the probability that any of Defendants statements were false or misleading. That the Covis Enterprise sold its assets for $1.2 billion "does not, on its face, indicate . . . misconduct" and is "consistent with a perfectly innocent explanation," namely that Concordia placed greater value on the Covis Enterprise's pharmaceutical assets than the Covis Enterprise had internally. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 60 F. Supp. 3d 479, 503 (S.D.N.Y. 2014), *aff'd*, 873 F.3d 85 (2d Cir. 2017).[5] Hence, this information would not have "prompted a reasonably diligent plaintiff to begin investigating" the Covis Enterprise. *Merck*, 559 U.S. at 653.

Because the sale of the Covis Enterprise's assets to Concordia would not have prompted a reasonably diligent plaintiff to begin investigating, the fact that different plaintiffs had made allegations against similar defendants in another case, *see Brown v. Cerberus Capital Mgmt., L.P.*, No. 15 CIV. 9022 (GBD), 2016 WL 7377271 (S.D.N.Y. Dec. 12, 2016), *aff'd*, 703 F. App'x 11 (2d Cir. 2017), does not render Lickteig's claims untimely. The Court cannot conclude that a reasonable plaintiff would have discovered the facts alleged in the *Brown* plaintiffs' federal complaint. The mere existence of civil litigation against a defendant for similar infractions is not necessarily enough to put "a reasonable investor of ordinary intelligence" on inquiry notice where the lawsuit "received no publicity whatever (not even in niche publications) and that did not, at least based on the record before [the Court], result in published or broadly disseminated opinions within the relevant time period." *Staehr*, 547 F.3d at 435. Hence, Defendants have not carried their burden to show that a

---

[5] Indeed, in their memorandum of law, Defendants argue that "[t]he Concordia transaction occurred during a short-lived and unprecedented acquisition-driven boom in the specialty pharmaceuticals market." Memorandum of Law in Support of Motion to Dismiss ("Mem."), Dkt No. 35, at 7 n.4. Although the Court does not accept this fact as true, it is illustrative of the fact that there may have been reasonable explanations other than fraud for the disparity between the valuation provided to Lickteig and the sale price to Concordia; specifically, the value of the Covis Enterprise's assets may have tripled during a price bubble.

"reasonable investor conducting . . . a timely investigation" would have discovered the facts based on the Brown plaintiff's filing. *City of Pontiac*, 637 F.3d at 174. As that is the only basis on which Defendants ask the Court to dismiss Lickteig's claims as time barred, their motion to dismiss is denied on this ground.

### b. Section 10(b) Claim

Lickteig has plausibly pleaded that two of Defendants' statements violated Section 10(b) and Rule 10b-5 Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b–5(b); *see also* 15 U.S.C. § 78j(b). To survive a defendant's motion to dismiss a Section 10(b) claim, a plaintiff must plausibly plead "(1) a material misrepresentation or omission; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)) (alterations omitted). Defendants challenge Lickteig's complaint with respect to the first and second elements.

### i. Material Misstatement or Omission

#### A. Legal Standard

Both affirmative misrepresentations and omissions can be actionable under Section 10(b). A defendant's statement is actionable if it "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005). Where a company does not have an obligation to speak but chooses to do so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation

omitted)).  Ultimately, companies "can control what they have to disclose under [Section 10(b) and Rule 10b-5] by controlling what they say to the market."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011).

Omissions can also be actionable under Section 10(b).  A plaintiff can state a claim for Section 10(b) liability based on an omission when the omission is "in contravention of an affirmative legal disclosure obligation" or the information that is not disclosed is "necessary to prevent existing disclosures from being misleading."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011).  With respect to the second category, the key is the "presence of a prior statement that otherwise is or will become materially misleading" as a result of the omission.  *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019); *see also SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) (holding that "literally true statements that create a materially misleading impression," or "so-called 'half-truths,'" can be actionable as securities fraud), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).

To incur liability, misrepresentations or omissions must also be material.  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Caiola*, 295 F.3d at 329 (quotation omitted).  "To be actionable, a misrepresentation must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention."  *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 507 (S.D.N.Y. 2009) (quotation omitted).  "Statements of 'hope, opinion, or belief about the company's future performance' are not actionable."  *Id.* (quoting *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)).  However, optimistic statements "may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . ., or that the opinions imply certainty."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) (citation omitted).

B. Application

i. Covis Holdings' Adjusted EBITDA for 2013

Lickteig's allegation that Covis Holdings Adjusted EBITDA for 2013 was higher than $62.2 million cannot serve as the basis for a securities fraud claim.  Lickteig alleges that on "information and belief, Covis Holdings' actual adjusted EBITDA for 2013 was millions of dollars higher than the $62.2 million reported to Lickteig in the Valuation."  Compl. ¶ 40.  Lickteig has failed to plead "why and how" this statement was "false and misleading."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  Lickteig has not pleaded any particularized facts on which his "information and belief" that Covis Holdings' adjusted EBITDA for 2013 was millions of dollars higher than $62.2 million.  And "it is well-settled that barebones allegations based on 'information and belief,' without more, are insufficient to support a securities fraud claim."  *Doscher v. Sobel & Co., LLC*, No. 14 CIV. 646 RMB, 2015 WL 774695, at *5 (S.D.N.Y. Feb. 11, 2015) (citing *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004)).  Therefore, because Lickteig has failed to allege the particularized facts upon which his "information and belief" rests, this statement cannot serve as a basis for securities fraud liability.

ii. The $750 Million to $1 Billion Valuation

For much the same reasons, Lickteig's allegation that Defendants failed to disclose that they "valued the pharmaceutical products acquired from GSK at $750 million to $1 billion" cannot serve as the basis for securities fraud liability.  Compl. ¶ 40.  In the complaint, Lickteig provides no facts to support his assertion—again, "on information and belief"—that Defendants in fact valued the pharmaceutical products acquired from GSK between $750 million to $1 billion.  And in the absence of particularized facts justifying Lickteig's belief that this valuation ever existed, it cannot serve as a basis for liability.

In his opposition, Lickteig clarifies that his "information and belief . . . is based on an appellate brief that the Brown plaintiffs filed in April 2019[.]"  Opp. at 15.  But "it is axiomatic that

the [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss." *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) (citations omitted).  The appellate brief in the Brown plaintiffs' suit is not attached to the complaint, incorporated in the complaint by reference, or integral to the complaint.  *See Lynch*, 952 F.3d at 79.  Therefore, the Court cannot consider this statement of the source of Lickteig's information and belief.  Consequently, because there are no allegations in the complaint sufficient to explain the source of Lickteig's "information and belief," this statement also cannot form the basis for a securities fraud liability claim.[6]

### iii. Potential Offers to Purchase the Covis Enterprise in the Summer of 2014

Defendants' alleged failure to disclose that they were engaged in negotiations to sell Covis Holdings is also not actionable.  Lickteig alleges that Defendants failed to disclose that "they were actively engaged in discussions to sell Covis Holdings or its pharmaceutical assets for substantially more than the TEV that they provided to Lickteig in the Valuation."  Compl. ¶ 43.  However, the Exchange Act does not "create an affirmative duty to disclose any and all material information," *Matrixx Initiatives*, 563 U.S. at 44, and "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  Rather, disclosure is only required "when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives*, 563 U.S. at 44 (quotation omitted).

Lickteig has not alleged any statements by Defendants that created a duty to disclose that they were engaged in negotiations with potential purchasers, as Lickteig has alleged in the complaint. The allegation that Defendants were engaged in merger negotiations does not make the financial information set forth in the Valuation, or the Valuation itself, false or misleading.  Indeed, the Valuation was entirely backward looking; it was based only on the 2013 Adjusted EBITDA and the

---

[6] The same is true of Lickteig's allegation that "in July 2014, a potential purchaser valued Covis Holdings's assets at $950 million."  Compl. ¶ 47.

TEV/EBITDA multiple.  Defendants' failure to disclose negotiations with potential purchasers did not render these figures false or misleading.  Although Lickteig may have considered this information relevant, that is not enough to make a statement false or misleading under the PSLRA. Therefore, because the allegation that Defendants were engaged in merger negotiations does not render any of Defendants' statements false or misleading, these statements cannot form the basis for a securities fraud claim.

iv.  <u>The TEV/EBIDTA Multiple</u>

Although the foregoing statements are not actionable, the complaint adequately alleges that the use of 7.5 as the TEV/EBIDTA multiple in the Valuation can serve as the basis for a securities fraud claim.  The Contribution Agreement required Covis Management to purchase Lickteig's Profit Interests at their "Fair Market Value," which was to be determined "in good faith by the Board of Managers, taking into account all relevant factors[.]"  Compl. ¶ 29.  In the Valuation, Defendants valued the Covis Enterprise using an EBITDA multiple of 7.5.  *Id.* ¶ 41.  Yet in October 2014, Mitchell told a Cerberus employee via email that a "reasonable multiple" would be "8-12X" EBIDTA.  *Id.*

Drawing all reasonable inferences in favor of Lickteig, the Court cannot conclude that Defendants' use of 7.5 as the EBITDA multiple in the Valuation was not misleading.  Granted, the selection of an EBITDA multiple may be characterized as a matter of opinion.  *See, e.g.*, *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005).  However, "liability for making a false statement of opinion may lie if . . . 'the speaker did not hold the belief she professed[.]'"  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).  Moreover, Defendants represented in the contract that they would determine the fair market value of Lickteig's shares in good faith.  Based on Mitchell's subsequent statement, it is plausible that he actually believed that the range of reasonable EBITDA multiples was between 8 and 12 when he presented the Valuation to Lickteig.  And if Mitchell did

19

not actually believe that 7.5 was within the range of reasonable EBITDA multiples, it is also plausible to infer that that Defendants chose 7.5 as an EBITDA multiple in bad faith, rendering their contractual representation that they would value Lickteig's Profit Interests in good faith false or misleading.

The choice of EBITDA multiple was material because it factored directly into the Valuation. Furthermore, Lickteig had a right to contest the valuation of his shares under the Contribution Agreement.  *See* Ex. A to Contribution Agreement at 4, § 4.  Lickteig chose not to exercise that right, but he may have acted differently if Mitchell had disclosed that 7.5 was outside what he considered to be a reasonable range of EBITDA multiples.  Consequently, Lickteig has plausibly alleged that the use of 7.5 as the EBITDA multiple in the Valuation is an actionable basis for a securities fraud claim.

To be sure, the allegations in the complaint are also consistent with a more benign version of events, in which Defendants genuinely believed that the lower EBITDA multiples they quoted to Lickteig were appropriate but had, months later, sharply raised the EBITDA multiple that they believed was appropriate.  However, at the pleading state, the Court must draw reasonable inferences in favor of the non-moving party.  *See Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 313 (S.D.N.Y. 2018) ("The parties' dispute on this issue amounts to a battle of competing inferences . . . [But] [o]n a motion to dismiss, the Court must draw 'all reasonable inferences in the plaintiff's favor.'") (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016)).  And because the facts in the complaint are consistent with Lickteig's theory of liability—that Defendants lowballed the company's EBITDA multiple because doing so meant that they had to pay Lickteig less for his Profit Interests—the Court cannot dismiss his claim as a matter of law.

v. <u>Adjusted EBITDA for 2014</u>

Lickteig has also plausibly alleged that Defendants' statement in the Valuation that Covis

Holdings' projected Adjusted EBITDA for 2014 was $68.5 million was misleading.  That is because

Lickteig has plausibly alleged that Defendants knew that their projected EBITDA was running

ahead of their projections for 2014 but deliberately chose not to update the $68.5 million figure in

the Valuation to account for that fact.  Lickteig alleges that "Defendants knew that the estimated

2014 Adjusted EBITDA of $68.5 million that [Defendants] provided to Lickteig in the Valuation . . .

was grossly understated." Compl. ¶ 38.  The factual basis for this assertion is a July 29, 2014 slide

deck, allegedly prepared for the Board of Directors of Covis S.á.r.l, which lists adjusted EBITDA as

$51.8 million.  *Id.*  Allegedly, "[t]he presentation further stated that this adjusted EBITDA was $18.4

million ahead of the 2014 annual plan of $33.5 million." *Id.*  Those allegations are sufficient to raise

an inference that Defendants knew that their projected EBIDTA for 2014 in the Valuation was

misleadingly low.

Even if Defendants' statement about their 2014 projected Adjusted EBITDA liability falls

within the PSLRA's definition of a forward-looking statement, the safe harbor provision does not

protect Defendants from liability.  "[A] defendant is not liable" for a forward-looking statement

under the PSLRA "if the forward-looking statement is identified and accompanied by meaningful

cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual

knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)

(emphases and citation omitted).[7]  Lickteig does not allege that the projection of Adjusted EBITDA

for 2014 was accompanied by meaningful cautionary language.

---

[7] A "forward-looking statement" under the PSLRA includes "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, . . . or other financial items[.]"  15 U.S.C. § 78u-5(i)(1)(A).  Defendants argue that "[p]rojected EBITDA . . . [is a] forward looking statement[] within the meaning of the PSLRA." *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 CIV. 0950 LAK AJP, 2015 WL 4931357, at *27 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).  Lickteig responds that the projection of Adjusted EBITDA for 2014 should have incorporated prior results for the first half of 2014 and that the safe harbor rule "does not apply to statements that incorporate both prior results and a projection of future

Moreover, the Court cannot conclude at this stage that the 2014 Adjusted EBITDA figure in the Valuation was immaterial.  Although the 2014 Adjusted EBITDA played no direct role in Mitchell's calculation of TEV, a reasonable investor in Lickteig's shoes might have decided to exercise his right to contest the fair market value of his shares as provided for in the Contribution Agreement if Defendants disclosed a higher 2014 Adjusted EBITDA figure.  Consequently, the Court cannot conclude at the pleading stage that the 2014 Adjusted EBITDA figure was immaterial as a matter of law.

Finally, construing the facts in the light most favorable to Lickteig, the allegations in the complaint are sufficient to raise an inference that Defendants had actual knowledge that their projected Adjusted EBITDA for 2014 was misleading.  As alleged, the presentation suggests that at the beginning of 2014, Defendants projected that their Adjusted EBITDA would be approximately $67 million.  That is because the presentation projected that the "2014 annual plan" projected that Covis Holdings' Adjusted EBITDA would be $33.5 million through the first two quarters of 2014. However, at the time of the presentation—mere weeks after Defendants had projected that Adjusted EBITDA would be $68.5 million in the Valuation—Defendants allegedly projected that EBITDA was running nearly $20 million above the projection in the annual plan for 2014.  That is sufficient to raise a reasonable inference that Defendants actually knew that the $68.5 million figure quoted in the Valuation was misleadingly low.  Thus, drawing all reasonable inferences in favor of Lickteig, he has sufficiently alleged that the projection of Adjusted EBITDA in the Valuation was misleading.[8]

---

performance."  Opp. at 14 (citing *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478-79 (S.D.N.Y. 2010)).  The Court need not decide whether the safe harbor rule provision applies because, even if it does, the Court concludes that Lickteig's allegations give rise to a reasonable inference that Defendants actually knew that the projection was false.

[8] To the extent that the complaint asserts that the "implied" 2014 EBITDA multiple of 6.8 in the Valuation is actionable, the Court disagrees.  The implied EBITDA figure for 2014 was apparently derived by dividing TEV, which was calculated using 2013 Adjusted EBITDA and the TEV/EBITDA multiple, by projected, adjusted EBITDA for 2014.  That is why the 2014 EBITDA figure was implied:  It was calculated mechanically based on the other figures in the Valuation.  Hence, the Court concludes that Defendants' statement of the implied 2014 EBITDA multiple was immaterial as a matter of law.

### ii. Scienter

#### A. <u>Legal Standard</u>

No defendant may be held liable for securities fraud unless Plaintiff has stated "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The Supreme Court has explained that the "PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation omitted). "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit." *ECA Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted).

In the Second Circuit, a plaintiff may plead scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138-139 (2d Cir. 2001) (quotation omitted). A plaintiff alleging scienter via recklessness must allege "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (quotation omitted).

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S at 314. If a fraudulent inference is not "at least as compelling" as a nonfraudulent one, it must be rejected, even in a "close case." *Slayton*, 604 F.3d at 777. An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation omitted); *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on

scienter goes to the plaintiff.").  In sum, "[t]he inquiry on a motion to dismiss is as follows:  'When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'"  *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007) (quoting *Tellabs*, 551 U.S. at 326).

> B. <u>Application</u>

Lickteig has adequately pleaded scienter with respect to the two statements that he has adequately alleged were false or misleading.  The Court has already discussed why, drawing all inferences in favor of Lickteig, it cannot conclude that Defendants did not have actual knowledge that their projected Adjusted EBITDA for 2014 was misleading.  Therefore, Lickteig has adequately alleged scienter with respect to that statement.

Lickteig has also alleged facts that raise an inference of scienter with respect to Defendants' projection of the 2013 EBITDA multiple that is cogent and at least as compelling as any competing inference.  Lickteig has plausibly pleaded that Defendants had both the motive and opportunity to commit fraud by lowballing their estimate of the 2013 EBITDA multiple.  Defendants' motive for doing so is clear:  A lower EBITDA multiple meant that Defendants were required to pay Lickteig less for his Profit Interests than they would have if the EBITDA multiple were higher.  And Lickteig's decision to redeem his Profit Interests presented an opportunity for Defendants to defraud Lickteig by choosing a low EBITDA multiple.  Lickteig's allegations also give rise to a compelling inference that Defendants engaged in conscious misbehavior by providing a low estimate of the EBITDA multiple.  At bottom, the allegations in the complaint raise the question:  Why would Defendants' estimate of a reasonable EBITDA multiple change drastically in a matter of months?  Defendants may well have a compelling answer to that question.  But Lickteig has met his

burden at the pleading stage to allege facts that create an inference of scienter that is at least as compelling as any alternative inference.[9]

Defendants incorrectly insist that the district court and Second Circuit's decisions in the *Brown* litigation weigh in favor of dismissal.  It is true that the *Brown* plaintiffs asserted claims for securities fraud against a similar set of defendants.  *See Brown*, 2016 WL 7377271, at *1.  However, the *Brown* plaintiffs relied on different alleged misstatements and different theories of fraud.  *See id.* at *2-3.  The *Brown* plaintiffs relied on two theories of fraud.  *Id.* at *2.  The first theory of fraud was based on a set of "'extra-contractual' statements" by two individuals who were named as defendants in *Brown* but are not named as defendants in this lawsuit.  *Id.* at *3.  The second theory of fraud was that Defendants terminated them in bad faith to prevent their profit interests from vesting.  *Id.* These claims—and the facts the *Brown* plaintiffs alleged in their complaint in support of them—have nothing to do with Lickteig's allegations in this case.  Therefore, both Judge Daniels' decision in *Brown* and the Second Circuit's affirmance of his decision are plainly distinguishable.[10]

### c. Release

#### i. Legal Standard

The release in the Separation Agreement does not preclude Lickteig's claims.  Section 2 of the Separation Agreement states that Lickteig waives all claims against the Covis Enterprise, including claims under the "laws, statutes, and/or regulations of the States of North Carolina, Iowa, or any other state and the United States."  *Id.* at 1-2, § 2.  However, under section 29(a) of the Exchange Act ("Section 29(a)"), "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder . . . shall

---

[9] Because the Court has concluded that Lickteig has adequately pleaded scienter, it need not decide whether the Iowa Uniform Securities Act requires a plaintiff to plead scienter to plausibly plead a claim.  *See Doud v. Toy Box Dev. Co., LLC*, 798 F.3d 709, 715 (8th Cir. 2015) (declining to decide whether the Iowa Uniform Securities Act requires a plaintiff to plead scienter because plaintiff had adequately pleaded scienter).

[10] Because Defendants' only argument for dismissal of Lickteig's claims for control person liability under state and federal law is that Lickteig has not plausibly alleged that a primary violation of Section 10(b), *see* Mem. at 13 n.7, the Court likewise declines to dismiss Lickteig's control person liability claims.

be void." 15 U.S.C. § 78cc(a).[11]  "This antiwaiver provision generally invalidates blanket releases of liability that accompany the purchase or sale of securities."  *Pasternack v. Shrader*, 863 F.3d 162, 171 (2d Cir. 2017).  "Accordingly, [courts] do not give effect to contractual language purporting to be a general waiver or release of securities-fraud liability altogether."  *Id.* (quotation and alterations omitted); *see also id.* ("The statutory framework of the 1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision." (quotation omitted)).

However, this does not mean that plaintiffs can never waive securities fraud claims.  Section 29(a) only forbids "enforcement of agreements to waive 'compliance' with the provisions of the statute."  *Id.* at 172 (quotation omitted).  "A release signed in the context of negotiations to settle an alleged securities violation cannot be said to 'waive compliance' with the securities laws; the aggrieved party receives an agreed remedy for an alleged securities violation, and that remedy satisfies 'compliance' with the securities laws."  *Id.*  Therefore, "as a general principle, whenever a party offers consideration to another in order to remedy an alleged violation of the securities laws, acceptance of that offer in exchange for a release of securities-fraud claims is tantamount to establishing 'compliance' with the securities laws.  Such contracts do not run afoul of § 29(a)."  *Id.* at 172-73.

Thus, the question is whether an agreement to release claims seeks to satisfy a pre-existing securities claim or waive future compliance with the securities laws.  Where the execution of the release "ha[s] nothing to do with satisfaction of a pre-existing securities claim," Section 29(a) voids the release.  *Id.* at 173.  A corollary of this principle is that a putative plaintiff must know that she might have a viable securities claim before she can release it.  Otherwise, it follows *a foritori* that the

---

[11] Section 502.509(12) of the Iowa Uniform Securities Act similarly states:  "A condition, stipulation, or provision binding a person purchasing or selling a security or receiving investment advice to waive compliance with this chapter or a rule adopted or order issued under this chapter is void."

putative plaintiff's release has nothing to do with the satisfaction of a pre-existing securities claim and is therefore voided by Section 29(a).

### ii. Application

Lickteig's claims are not barred by his release. The Separation Agreement states that Lickteig "shall not be entitled to the consideration set forth in Section 4 of this Separation Agreement" if he did not return a signed Separation Agreement by August 22, 2014. *Id.* at 6, § 14(A). Rather, the Separation Agreement provided consideration for Lickteig's Profit Interests. Moreover, there is no indication that Lickteig contemplated that he had a securities fraud claim at the time he signed the release. Indeed, Lickteig signed the release as part of the same transaction on which his claim for securities fraud is premised. For that reason, it is highly implausible—if not impossible—that the release had anything "to do with satisfaction of a *pre-existing* securities claim." *Pasternack*, 863 F.3d at 173 (emphasis added). Accordingly, the release does not bar Lickteig's securities fraud claim in this case.

## B. Rule 12(b)(2) Motion

### 1. Legal Standard

Defendants move to dismiss Lickteig's claims against Defendant Dean Mitchell for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). On a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." (citation omitted)). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d

Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At the pleading stage—and prior to discovery—a plaintiff need only make a prima facie showing that jurisdiction exists. *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

If the court considers only pleadings and affidavits, the plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quotation marks omitted)).  Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction.  *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).  "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).  If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking*, 989 F.2d at 580 (citations omitted).

### 2. Application

The Court does not have personal jurisdiction over Mitchell.  Lickteig's sole argument that the Court has personal jurisdiction over Mitchell is that "[t]he Separation Agreement contains a forum selection clause requiring Lickteig to consent to the 'sole jurisdiction of the federal and state

courts of New York.'"  Opp. at 24 (quoting Separation Agreement at 5, § 12).[12]  However, Mitchell is not a signatory to the Separation Agreement.  "It is well established that, generally, a party who is not a signatory to a contract cannot be held liable for breaches of that contract."  *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (collecting cases applying New York law).  Lickteig nonetheless argues that Mitchell is bound by the Separation Agreement because he is so "'closely related' to" its execution that it was "'foreseeable' that [he would] be bound by it."  Opp. at 25 (quoting *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767(LBS), 2003 WL 22882137, at *5 (S.D.N.Y. Dec. 4, 2003)).

The Court does not have jurisdiction over Mitchell based on the Separation Agreement's forum-selection clause.  Lickteig points to allegations in the complaint concerning Mitchell's conduct with respect to the Separation Agreement and the claims at issue in this case.  *See id.* ("[Mitchell] was the chairman of the board of directors of Covis S.á.r.l., which was the wholly owned subsidiary of Covis Holdings that held the rights to the pharmaceutical products purchased from GSK on which the Covis Enterprise's value was based." (citing Compl. ¶¶ 15, 17, 22)); *id.* ("Acting as Defendants' agent, [Mitchell] provided Lickteig with the Valuation and had all conversations with Lickteig regarding Defendants' purchase of this Profit Interests.") (citing Compl. ¶¶ 30-32)).

Crucially, however, Mitchell undertook these actions in his corporate capacity.  "Jurisdiction over a corporation's board member, officer or employee, in his or her individual capacity, must be premised on the defendant's own personal contacts with the forum, and not the acts and/or contacts carried out by the defendant in his or her corporate capacity."  *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 471 (S.D.N.Y. 2010) (collecting cases), *vacated and remanded in part on other grounds*, 714 F.3d 109 (2d Cir. 2013); *see also Giuliano v. Barch*, No. 16 CV 0859 (NSR), 2017 WL

---

[12] The Separation Agreement contains a choice of law provision stating that "any and all matters arising directly or indirectly [from the Separation Agreement] shall be governed under the laws of the State of New York."  Separation Agreement at 5, § 12.  Therefore, the Court applies New York law to its construction of the Separation Agreement.

1234042, at *12 n.24 (S.D.N.Y. Mar. 31, 2017) ("The Court notes that to subject Defendants, . . . none of whom happen to live in New York . . . to personal jurisdiction in New York . . . in their individual capacity . . . based upon a single contract signed in their official capacity . . . would not . . . 'comport with traditional notions of fair play and substantial justice,' and therefore fails to satisfy the [requirements of the] Due Process Clause." (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945))).  The complaint does not allege any acts Mitchell undertook in his individual capacity that would subject him to the jurisdiction of this Court. The Court therefore does not have personal jurisdiction over Mitchell based on the forum-selection clause.  And because Lickteig has failed to make any other allegations with respect to why the Court has personal jurisdiction over Mitchell, he has failed to meet his burden to make a prima facie showing that the exercise of such jurisdiction would be proper.  Accordingly, Defendants' motion to dismiss the claims against Mitchell for lack of personal jurisdiction is granted.

## III. CONCLUSION

For the foregoing reasons, Defendants' Rule 12(b)(6) motion is GRANTED in part and DENIED in part.  Lickteig has adequately alleged a claim for securities fraud and control person liability with respect to the two statements the Court identified in its discussion.  Therefore, Defendants' motion to dismiss is denied as to those statements.  The motion is granted as to all other of Defendants' statements identified in the complaint.  Defendants' Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction as to Defendant Dean Mitchell is also GRANTED.  The Court grants Lickteig leave to replead if he so chooses.  *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead." (citation omitted)).  Any amended complaint must be filed no later than thirty days from the date of this order.

The Clerk of Court is directed to terminate the motion pending at Dkt No. 34 and to

remove the name of Defendant Dean Mitchell from the caption of this case.

SO ORDERED.

Dated:  April 26, 2020

_____
GREGORY H. WOODS
United States District Judge