USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/7/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RONALD LICKTEIG,                                    :
                                                    :
                              Plaintiff,            :
                                                    :                    1:19-cv-05263-GHW
              -against-                             :
                                                    :          MEMORANDUM OPINION &
CERBERUS CAPITAL MANAGEMENT, L.P.,                  :                    ORDER
COVIS PHARMACEUTICALS, INC., COVIS                  :
MANAGEMENT INVESTORS LLC, and                       :
COVIS S.À.R.L., L.P.,                               :
                                                    :
                              Defendants.           :
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

Plaintiff Ronald Lickteig's contract gave him the option to require defendants Cerberus

Capital Management, L.P. ("Cerberus"), Covis Pharmaceuticals, Inc. ("Covis"), Covis Management

Investors LLC (the "MIP Limited Partner"), and Covis Holdings, L.P. ("Covis Holdings") (together

with Cerberus, Covis, and Covis Management, the "Defendants") to purchase his equity interests in

Covis at "Fair Market Value" if he resigned or otherwise left the company.  He resigned.  And

Defendants sent him a document valuing Covis and his equity interests at $466.7 million and $1.1

million respectively.  Lickteig and Defendants engaged in negotiations and ultimately settled on a

payment of $1.3 million for Lickteig's equity interests.

At the same time as these negotiations—unbeknownst to Lickteig—Defendants were

attempting to sell Covis and refused an initial offer because it did not exceed $1 billion.  Just months

after Lickteig was told the company was worth $466 million, Covis was sold for $1.2 billion.

Lickteig brought this action alleging that Defendants violated both federal and Iowa law by

misrepresenting certain numbers underlying the valuation of his interests and by failing to disclose

that Defendants were attempting to sell Covis for a much higher amount than the value represented

to Lickteig.

Defendants now move for summary judgment, arguing that the record indisputably establishes that the alleged misrepresentations were honestly held statements of opinion and that Defendants were not required to disclose the negotiations.  Because Defendants contemporaneously used different Adjusted EBITDAs and Adjusted EBITDA multiples when negotiating the purchase of Lickteig's equity interests and attempting to sell Covis to a third party, material issues of fact exist regarding whether the numbers conveyed to Lickteig were false or misleading and whether Defendants' failure to disclose the fact of the ongoing negotiations to sell the company at a substantially higher valuation rendered the valuation conveyed to Lickteig false or misleading.  Accordingly, Defendants' motion for summary judgment is DENIED.

Defendants also move to exclude the testimony of Plaintiff's designated experts—Jeffrey Ammerman and Philip Kanyuk.  Because the Court finds that both experts are qualified, apply reliable principles and methods, rely on sufficient facts and data, and will assist the trier of fact—and because Defendants' arguments to exclude the testimony of Plaintiff's designated experts go to weight rather than admissibility—Defendants' motions to exclude the testimony of Ammerman and Kanyuk are DENIED.

## I.    BACKGROUND

Much of the relevant factual background described below is undisputed by the parties.[1] Where disputes exist, the Court draws all reasonable inferences in favor of the non-moving party— Plaintiff Lickteig.[2]  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (holding that a court is

---

[1] Throughout the responses to Defendants' Rule 56.1 statement and Plaintiff's counterstatement, the parties raise two consistent issues.  Plaintiff repeatedly disputes facts to the extent Defendants "misleadingly" use "valuation" to mean fair market value as opposed to fair value. *See, e.g.,* Defs.' 56.1 ¶ 57.  And Defendants repeatedly dispute facts "to the extent the statement assumes there is such a thing as a single defined adjusted EBITDA." *See, e.g.,* Pl.'s 56.1 ¶ 185.  While these highlight the parties' arguments regarding the meaning of these terms, they do not meaningfully dispute the facts in the Rule 56.1 statement and counterstatement.

[2] The Court does not, however, credit any facts raised in Lickteig's Declaration (*see* Decl. of Ronald Lickteig in Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 165) that would contradict Lickteig's previous deposition testimony.  *See Hayes v. N.Y.C. Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (holding that "a party may not create an issue of fact by

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought") (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

A.   Covis Pharmaceuticals' Ownership and Operations

Covis was a pharmaceutical enterprise established to acquire the rights to neglected off-patent drugs from larger pharmaceutical companies and to try to increase the profitability of those drugs through more active management.  Pl.'s Resp. to Defs.' Rule 56.1 Statement, Dkt. No. 169 ("Defs.' 56.1"), ¶¶ 1–2.  The insight that led to the development of Covis was sparked by two pharmaceutical industry executives, Bill Collins and Jack Davis.  Defs.' 56.1 ¶ 3.  Collins and Davis retained Bourne Partners, an investment banking firm, to raise capital to acquire the rights to a portfolio of pharmaceutical products from GlaxoSmithKline ("GSK").  Defs.' 56.1 ¶ 4.  Bourne Partners then contacted Cerberus to solicit its investment in Covis, and Cerberus ultimately decided to invest in the company.  Defs.' 56.1 ¶ 5.  In December 2011, Covis acquired an initial portfolio of drugs from GSK.  Defs.' 56.1 ¶ 7.

The Covis[3] enterprise consisted of both U.S. and international entities and was effectively owned and controlled by Cerberus.  *See* Decl. of Sheila Sadighi in Supp. of Defs.' Mot. for Summ. J., Dkt. No. 140 ("Sadighi Decl."), Ex. 2.  Switzerland-based Covis Pharma S.à.r.l. acquired intellectual property and manufacturing rights to drugs, and the U.S.-based Covis Pharmaceuticals, Inc. distributed those drugs in the U.S. pursuant to a distribution agreement.  Defs.' 56.1 ¶ 10.

---

submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony").

[3] The Covis enterprise consisted of several companies, including, among others, Covis Pharmaceuticals, Covis Management Investors LLC ("the "MIP Limited Partner"), Covis Holdings, L.P. ("Covis Holdings"), and Covis Pharma Holdings, S.á.r.l..  The Court refers to "Covis" throughout its opinion to refer to the Covis enterprise as a whole.

B.  Lickteig's Contribution Agreement and "Profits Interests"

Lickteig was a former executive at GlaxoSmithKline.  Cerberus and Covis recruited Lickteig to serve as the General Manager of Covis.  Pursuant to a contribution agreement between Lickteig, the MIP Limited Partner, and Covis Holdings (the "Contribution Agreement"), Lickteig was granted equity interests, referred to as "Profits Interests," equivalent to 200,000 Class B partnership interests in Covis Holdings, or 2.0% of the fully diluted equity of Covis Holdings.  Defs.' 56.1 ¶¶ 11–12; Sadighi Decl., Ex. 5.  Half of Lickteig's equity interests vested according to a time schedule, and the remainder would vest upon a "Winding Up Event" in an amount depending on the return on invested capital realized through such an event.  Defs.' 56.1 ¶ 14.

Following any not-for-cause termination of Lickteig's employment (including his resignation), Lickteig could exercise a put option (the "Put Option") whereby he could "compel [Covis] to purchase from [Lickteig] all, but not less than all" of his equity interests that had vested as of the date of his termination.  Defs.' 56.1 ¶ 15.  Covis would have to purchase the equity interests at "Fair Market Value"—as defined in the MIP Limited Partner's operating agreement (the "Operating Agreement")—as of the date of termination.  Defs.' 56.1 ¶ 16.  The Operating Agreement defined Fair Market Value as:

> [W]ith respect to any Profits Interest or any asset or liability, as applicable, the fair market value of such Profits Interest, asset or liability, as determined in good faith by the Board of Managers, taking into account all relevant factors, including without limitation the most recent valuation, prior to such determination, of the Company and/or its equity interests (provided that the Board of Managers shall provide written notice to the Management Members of such determination).

Defs.' 56.1 ¶ 17.  The Contribution Agreement obligated Covis to provide Lickteig with a good-faith determination of Fair Market Value, after which Lickteig was entitled to provide Covis with a written dispute notice "[setting] forth in reasonably specific detail the good faith basis of the dispute, including (i) the value that Contributor reasonable believes should be ascribed to the Subject

Lickteig Profits Interests and (ii) all facts and figures that Contributor reasonably believes supports Contributor's view of the relevant valuation."  Contribution Agreement, Ex. A ¶ 4(b).  Under the terms of the Contribution Agreement, if Lickteig and Covis could not agree on Fair Market Value, each would select an independent third-party appraiser, who would together select a third appraiser, and the third appraiser would appraise the Fair Market Value of the equity interests.  *Id.*  If Lickteig did not provide the MIP Limited Partner with a dispute notice, however, "the Fair Market Value [would] be conclusively deemed to be equal to the Fair Market Value established by the MIP Limited Partner . . . ."  *Id.*

C.  Adjusted EBITDA

Both Cerberus and Covis regularly assessed Covis' performance and value based on calculations of adjusted EBITDA.  EBITDA means earnings before interest, taxes, depreciation, and amortization.  Defs.' 56.1 ¶ 22.  EBITDA is not a defined metric under Generally Accepted Accounting Principles ("GAAP").  Defs.' 56.1 ¶ 23.  "Adjusted EBITDA" is a non-GAAP measure that may be computed by adding back or subtracting out certain one-time events.  Defs.' 56.1 ¶ 26.[4] Which items are added back or subtracted out to reach adjusted EBITDA is determined by the person making the calculation and may change depending on the purpose of computing the metric. Thus, a company may define adjusted EBITDA differently in different situations.  Determining what adjustments are appropriate for calculating an adjusted EBITDA "requires much judgement." Defs.' 56.1 ¶ 29.

---

[4] Plaintiff disputes Defendants' characterization of adjusted EBITDA as having "no singular definition."  However, the substance of that dispute, including Investopedia's definition of adjusted EBITDA, does not contradict Defendants' characterization (*i.e.* that adjusted EBITDA is computed by adding back or subtracting out certain one-time events, but that those events are not defined and are determined by the company).  *See* Defs.' 56.1 ¶ 26.  In addition, the Court notes that, while not pertinent to this case, "adjusted EBITDA" can also be defined by adding back or subtracting recurring events, items of income and expenses.

   D.  Cerberus's Valuation Policy

It was the policy of Cerberus to determine the fair value of its investments, in accordance

with GAAP, on a quarterly basis.  Defs.' 56.1 ¶ 38.  Cerberus performed those valuations in

accordance with its written valuation policy and procedures, which were consistent with GAAP.

Defs.' 56.1 ¶¶ 38–39.  These valuations, referred to as "Marks," were determined by Cerberus's

valuation committee after reviewing and discussing valuations prepared by Cerberus's private equity

valuation group.  Defs.' 56.1 ¶ 41.  The valuation group collected and analyzed data about Covis,

gathered and reviewed market data, ran models, and discussed potential adjustments.  Defs.' 56.1

¶ 42.  The valuation group's work was reviewed and adjusted by Cerberus's CFO and the valuation

committee.  Defs.' 56.1 ¶¶ 44–45.  And, semi-annually, the Marks were reviewed by Cerberus's

independent valuation advisor—Duff & Phelps—to determine whether the Marks were reasonable.

Defs.' 56.1 ¶ 46.

Still, the Marks were not a definitive measure of the fair market value of Covis.[5]  Cerberus

set its Marks at intentionally conservative levels because Cerberus did not want its investors to see

---

[5] Under the terms of the Contribution Agreement, Fair Market Value was defined as in the MIP Limited Partner
Operating Agreement, which defines Fair Market Value as:

   [W]ith respect to any Profits Interest or any asset or liability, as applicable, the fair market value of such
   Profits Interest, asset or liability, as determined in good faith by the Board of Managers, taking into
   account all relevant factors, including without limitation the most recent valuation, prior to such
   determination, of the Company and/or its equity interests (provided that the Board of Managers shall
   provide written notice to the Management Members of such determination).

Sadihi Decl., Ex. 6.  That agreement is governed by Delaware law, which defines fair market value as "'the price at which
the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy
or to sell and both having reasonable knowledge of relevant facts.'"  *Clean Harbors, Inc. v. Safety-Kleen, Inc.*, 2011 WL
6793718, at *4 (Del. Ch. Dec. 9, 2011) (quoting *United States v. Cartwright*, 411 U.S. 546, 551 (1973)).  While Defendants
attempt to recast the contractual definition of Fair Market Value as limited by the consideration of the Company's most
recent valuation, this reading is contrary to the text.  Instead, a Fair Market Value means "fair market value," as defined
under Delaware law, with the proceeding text assigning the duty to determine Fair Market Value to the Board of
Managers and providing the mechanism by which they must make such a determination (*i.e.* in good faith and
considering all relevant information).  But the *sine qua non* of the definition is that "Fair Market Value" means fair market
value.

the "swing of ups and downs." *See* Pl.'s 56.1 ¶ 293, 295.  Even when a tentatively negotiated sale price for an asset exceeded the current Mark, Cerberus kept that Mark below the negotiated price until the deal closed.  Pl.'s 56.1 ¶ 294.  Further, Cerberus's Marks were typically set below fair market value to "smooth" increases in the value of Cerberus's portfolio and give "more of a steady profile in terms of gains."  Pl.'s 56.1 ¶ 296.  Finally, it is not clear whether the Marks had any impact on the Lickteig Valuation as Mitchell, who transmitted the Lickteig Valuation to Lickteig, never saw them. Pl.'s 56.1 ¶ 292.

       E.   <u>2013 Cerberus Valuation of Covis</u>

On April 4, 2013, Covis purchased the manufacturing and distribution rights to a portfolio of five drugs from Sanofi Aventis ("Sanofi") for $220 million, or approximately 4.9x the sustainable EBITDA for those drugs (the "Sanofi Acquisition").  Defs.' 56.1 ¶ 35.  Covis management viewed the Sanofi Acquisition as "[growing] Covis from approximately $15.0 mm run-rate EBITDA to $60.0–65.0mm run-rate EBITDA[.]"  Defs.' 56.1 ¶ 36.  Following the Sanofi acquisition, Cerberus valued its investment in Covis by applying a multiple to Covis's run rate EBITDA to determine Total Enterprise Value ("TEV").[6]  Defs.' 56.1 ¶ 50.  As of December 31, 2013, Cerberus's valuation committee applied a multiple of 6.0 to an an estimated "Run-Rate December 2013 EBITDA" of $60 million to arrive at a TEV for Covis of $360 million.  Defs.' 56.1 ¶ 56.  As of March 31, 2014, Cerberus's valuation committee applied a multiple of 5.2 to an estimated 2014 run rate EBITDA of $65 million to arrive at a TEV of $335.4 million for Covis.  Defs.' 56.1 ¶ 57.

---

[6] Plaintiff objects to this line of facts, arguing in part that it constitutes an undisclosed expert opinion. *See, e.g.*, Defs.' 56.1 ¶¶ 50–56.  It is not clear to the Court why evidence regarding the historical facts of how Cerberus made its fair value determinations constitutes an expert opinion.  However, the Court need not answer this question here, as this objection is best brought as a motion *in limine* prior to trial.

F.  2013 Sale Attempt

In September 2013, five months after the Sanofi Acquisition, Covis undertook a process to explore selling the company—code named Project Crown.  Defs.' 56.1 ¶ 64.  Defendants assert that Cerberus viewed Project Crown as a "fishing expedition" to see if a potential buyer would attribute significant value to Covis's structure, which allowed for a tax inversion transaction. [7]  Defs.' 56.1 ¶ 67.  Covis's advisor for Project Crown, Morgan Stanley, solicited 18 potential buyers.  Defs.' 56.1 ¶ 69.  But Project Crown failed to yield a single bid.  Defs.' 56.1 ¶ 68.  At his deposition, chairman of the Private Equity Investment Committee and a Senior Managing Director of Cerberus, and former Covis S.à.r.l. Board member, W. Brett Ingersoll, testified that he believed that Covis was "not going to be one of the lucky few that would be valued extraordinarily high based upon inversion potential" because "the acquirers didn't see enough value in the inversion given the products that we had acquired . . . ."  Defs.' 56.1 ¶ 75.

G.  Collins Valuation

Covis CEO Bill Collins was terminated as of December 31, 2013, and a valuation of his profits interest (the "Collins Valuation") was prepared for the repurchase of his equity interests.  Defs.' 56.1 ¶ 105.  In early March 2014, Covis prepared a slide presentation outlining the Collins Valuation (the "Collins Valuation Deck").[8]  *See* Sadighi Decl. Ex. 17.  The first slide of the Collins Valuation Deck stated that Covis's "2013 Adjusted EBITDA" was $62.2 million, and applied an EBITDA Multiple of 6.0x, to arrive at a TEV of $373.4 million.  Pl.'s 56.1 ¶ 182.  The Collins Valuation Deck stated that the phrase "2013 Adjusted EBITDA" referred to Covis's "Q4-13 Run

---

[7] "An inversion is a corporate merger where a U.S. based company merges with a foreign corporation to create a new corporate entity that is incorporated outside the United States of America. For tax purposes, the new entity becomes foreign owned, which reduces the company's overall tax liability."  *In re Medtronic, Inc. Derivative Litig.*, 68 F. Supp. 3d 1054, 1057 (D. Minn. 2014) (quotation marks omitted).

[8] Defendants dispute whether Collins was provided with the Collins Valuation Deck, but do not dispute that the document was created for the Collins Valuation or that it represents the valuation model upon which they based the Collins Valuation.  Defs.' Resp. to Pl.'s Rule 56.1 Counterstatement, Dkt. No. 183 ("Pl.'s 56.1"), ¶ 180.

Rate Adjusted EBITDA." Pl.'s 56.1 ¶ 187. The Q4-13 Run Rate Adjusted EBITDA was purportedly based on Covis's Q4 2013 Adjusted EBITDA annualized with additional adjustments, including a "Q4 Normalization." Pl.'s 56.1 ¶ 188. The Collins Valuation Deck also stated that Covis's Q4 2013 Adjusted EBITDA was $16.95 million, annualized to $67.813 million, before being adjusted to arrive at the Q4-13 Run Rate Adjusted EBITDA of $62.2 million. Pl.'s 56.1 ¶ 189.

The Collins Valuation utilized the same 6.0x EBITDA multiple that Cerberus used in its valuation of Covis. Defs.' 56.1 ¶ 112. The Collins Valuation thus applied a 6.0x multiple to a 2013 adjusted EBITDA of $62.2 million to arrive at a TEV of $373.4 million as of December 31, 2013, a valuation which Collins accepted.

However, at a January 29, 2014 Covis board meeting, the 2013 Adjusted EBITDA reported and approved was $78.5 million—$16.3 million higher than the Adjusted EBITDA figure provided to Collins just less than a month before. Pl.'s 56.1 ¶ 185; Decl. of Joshua Seifert in Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 170 ("Seifert Decl."), Ex. G. At deposition, Michael Palmer—a member of Covis's board—testified that he did not know why the "2013 Adjusted EBITDA" number on the Collins Valuation differed from the "2013 Adjusted EBITDA" number approved by Covis, (Pl.'s 56.1 ¶ 184), meaning it is not clear whether the definition of adjusted EBITDA differed between the two documents or whether the number was simply changed.

The Collins Valuation Deck also stated that the "2014 Adjusted EBITDA" was $68.5 million, which implied an EBITDA multiple of 5.5x. Pl.'s 56.1 ¶ 183. The phrase "2014 Adjusted EBITDA" referred to "FY 14 Run Rate Adjusted EBITDA." Pl.'s 56.1 ¶ 193. The FY 14 Run Rate Adjusted EBITDA was the Projected FY 14 Annual Operating Plan ("AOP") Adjusted EBITDA of $76.8 million, but reduced by $8.272 million because of a purported "Lanoxin AG Stocking Order One Time." Pl.'s 56.1 ¶ 194. The $8.272 million figure was based on estimated "3 MOS of sales." Pl.'s 56.1 ¶ 195. At the same January 29, 2014 Covis board meeting, FY 14 AOP Adjusted EBITDA

was reported and approved at $76.8 million, but no reference was made to a reduction for "Lanoxin AG Stocking Order." Seifert Decl. Ex. G.

### H. 2013 and Projected 2014 Financial Performance

As noted above, at the January 29, 2014 board meeting, the Covis board reviewed and approved a report stating that Covis's 2013 Adjusted EBITDA was $78.5 million and approved a forecast of 2014 Adjusted EBITDA of $76.8 million as part of its 2014 AOP. Pl.'s 56.1 ¶ 199. In the 2014 AOP, Covis stated that "Q4'13 represents true run rate performance of the business post Sanofi acq integration." Pl.'s 56.1 ¶ 190. The same presentation reflected a "Q4'13 Annualized" "Adjusted EBITDA" of $69.1 million. Pl.'s 56.1 ¶ 191. But the "Run Rate EBITDA" based upon the 2014 AOP was reported to the Covis board as $78.2 million. Pl.'s 56.1 ¶ 201. Defendants dispute whether Covis use a consistent definition of Run Rate EBITDA or Adjusted EBITDA. *See, e.g.*, Pl.'s 56.1 ¶ 201. But as the record does not disclose Covis's adjusted EBITDA definition or definitions, whether Covis in fact used a consistent definition of adjusted EBITDA is an issue for the trier of fact.

### I. Early 2014 Financial Performance

In early 2014, Covis undertook a strategic review to "identify and assess alternative strategies and reach recommendations on initiatives most likely to result in strategic exit at attractive valuations within a reasonable timeframe[.]" Defs.' 56.1 ¶ 77. In a presentation to the board, Covis management recommended that the company "invest to create high value diversified specialty pharma business that will be attractive to a wide range of buyers for exit within a 3 year horizon." Sadighi Decl. Ex. 18. But management also recommended that the company should "retain the flexibility to switch to a shorter-term profit maximization focus if the tax advantages of inversions are under threat. Detailed activities in the short-term are designed to maintain this flexibility until we have clarity about tax inversions." *Id.* The presentation outlined several potential scenarios

where Covis could be sold in 2018 for an EBITDA multiple ranging from 6.4x to 9.4x, depending both on whether its Lanoxin franchise was shown to be consistently successful, and on the volume and success of future acquisitions. Defs.' 56.1 ¶ 83. In the early part of 2014, Covis sought to offset an expected drop in revenues from a drug called Rilutek—which Covis had acquired from Sanofi before the drug went off-patent in mid-2013—with several new initiatives including, primarily, new launches of "Lanoxin Retail" and "Lanoxin Authorized Generic" ("Lanoxin AG"). Defs.' 56.1 ¶ 88.

On March 28, 2014, Michael Porter, then CEO of Covis, wrote Credit Suisse, "[W]e are materially exceeding plan/underwriting case with run rate for a $90mm+ Adj EBITDA this year." Pl.'s 56.1 ¶ 202.

At its meeting on April 28, 2014, following the first quarter of 2014, the Covis board noted that sales were ahead of the AOP forecast. Defs.' 56.1 ¶ 89. The board presentation at that meeting also noted higher than anticipated Lanoxin AG market share, and that Covis was able to take advantage of "prices 15–20% higher than plan due to mix and no new market entrants." Defs.' 56.1 ¶ 94. Some of Covis's larger competitors were experiencing quality problems with their manufacturers in 2014, allowing Covis to capture greater market share and higher pricing than anticipated prior to 2014. Defs.' 56.1 ¶ 97. The Q1 2014 Board Meeting presentation stated that Covis was "[m]aterially exceeding [the AOP] on Adjusted EBITDA." Pl.'s 56.1 ¶ 203. And it also noted that Covis had realized a "run-rate EBITDA of $85–87mm" over the last twelve months. Pl.'s 56.1 ¶ 204; Seifert Decl., Ex. K. Those figures were reported to Credit Suisse and ratings agencies. Pl.'s 56.1 ¶ 205. Through the first quarter [of 2014], Covis was $13.0 million ahead of the 2014 AOP projection of $15.4 million. Pl.'s 56.1 ¶ 206. Despite exceeding projected results in the first quarter, the board maintained its original 2014 AOP projected adjusted EBITDA of $76.8 million. Defs.' 56.1 ¶ 91.

Covis management also prepared a supplement to the April 29, 2014, Board of Directors Presentation (the "Supplement"). Pl.'s 56.1 ¶ 210. The Supplement noted that the CEO of Akorn, Inc. ("Akorn") had contacted Banks Bourne, a Covis board Member, "multiple times" in light of the IRS's indication that it might disallow certain types of inversion transactions. Pl.'s 56.1 ¶ 211. The Supplement also stated the following: "Mgmt expects more unsolicited inbound inquiries over next month." Pl.'s 56.1 ¶ 212. Among the strategies discussed in the Supplement was to "Sell entire business" to Par or Akorn for $1.0–$1.2b." Pl.'s 56.1 ¶ 215. The Supplement described the probability of the sale strategy as "high." Pl.'s 56.1 ¶ 216.

J.   Lickteig's Resignation and the Lickteig Valuation

On May 20, 2014, Plaintiff gave written notice of his resignation from Covis to Michael Kelly, Covis's CEO. Defs.' 56.1 ¶ 100. Lickteig voluntarily resigned effective June 6, 2015 (the "Valuation Date"), and exercised the Put Option on his 95,000 vested equity interests three days later. Pl.'s 56.1 ¶ 217.

After Plaintiff exercised his Put Option, Dean Mitchell—Chairman of the board for non-party Covis S.a.r.l. Holdings—and Palmer discussed preparation of a valuation of Lickteig's equity interests. Defs.' 56.1 ¶ 123. On June 30, 2014, Mitchell emailed Palmer regarding the valuation of Lickteig's equity interests, stating: "We discussed running a 25% and 50% premium over the valuation offered to [Collins]. Nothing magic in the logic." Pl.'s 56.1 ¶ 219.

On July 2, 2014, Bill Straccia of Cerberus emailed Mitchell a file titled "Ron Lickteig Valuation." Pl.'s 56.1 ¶ 220. The document presented three scenarios representing a 0%, 25%, and 50% increase over the Collins Valuation. Each scenario used the same "2013 Adjusted EBITDA" of $62.2 million, while altering the EBITDA Multiples from 6.0x to 7.5x to 9.0x to achieve the desired premium, resulting in TEVs of $373.4, $466.7, and $560.1 million. Pl.'s 56.1 ¶ 221. Covis did not adjust the financial figures from the Collins Valuation: Plaintiff argues that this was despite

Defendants having six additional months of data and materially exceeding the 2014 AOP, while Defendants argue the 2014 AOP had not changed at the time of the Lickteig Valuation.  Pl.'s 56.1 ¶ 222.

On July 3, 2014, Mitchell responded to Straccia's analysis writing that "the 25% premium to Bill makes sense to me.  I have a call with Ron tomorrow so will test this valuation."  Pl.'s 56.1 ¶ 223.  The next day, Mitchell told Lickteig that Covis was worth $466 million with $160 million to Profits Interests holders, entitling Lickteig to $1.1 million.  Pl.'s 56.1 ¶ 224.  Because the valuation was lower than he had hoped, Lickteig asked whether Covis would pay him $1.3 million or allow him to keep one third of his Profits Interests until a later date.  Pl.'s 56.1 ¶ 225.  Mitchell later told Palmer that they had "reached two options for a negotiated settlement."  Pl.'s 56.1 ¶ 226.

Lickteig took handwritten notes during his July 3, 2014 call with Mitchell.  Defs.' 56.1 ¶ 128. He wrote down several numbers, including "466 M enterprise value," and "$1.1M current value," referring to the value of his equity interests.  Defs.' 56.1 ¶ 129.  Lickteig sent a follow-up email after the call thanking Mitchell for the "candid conversation" and stating that he was "ok with the stated enterprise value of $466M" from which the valuation of his equity interests was determined.  Defs.' 56.1 ¶ 130.  Although the Lickteig Valuation valued Lickteig's equity interests at $1.1 million, Mitchell confirmed that "Covis would be prepared to acquire all of [Lickteig's] Profit Interest in complete settlement for $1.3 million."  Defs.' 56.1 ¶ 133.

On July 11, 2014, Mitchell requested a version of Lickteig's valuation "showing only the middle column (7.5X multiple), deleting the other columns and the memo referring to the premium to Collins.  Pl.'s 56.1 ¶ 227.  Mitchell sent the Lickteig Valuation to Lickteig on July 12, 2014.  Pl.'s 56.1 ¶ 228.  The 2013 Adjusted EBITDA listed in the Lickteig Valuation was $62.2 million.  The 2014 Adjusted EBITDA was listed as $68.5 million.  The Lickteig Valuation did not disclose what adjustments were made to calculate the Adjusted EBITDAs provided.

13

Following his receipt of the Lickteig Valuation, Lickteig emailed Mitchell two questions:

1) Adjusted EBITDA.  Why was adjusted used instead of EBITDA itself?  Guess the question is, were the adjustments one time, certain compensation parameters, etc?  Maybe not significantly different, but would be nice to know. 2) TEV/EBITDA multiple:  In the analysis shows 7.5X.  Any comparable that I have seen from Borne [sic] (attached) shows no TEV multiple less than 10X for a generic company and 12.1 for specialty phrama.  Why would Covis be 2.5-5 points lower, especially with our structure?

Defs.' 56.1 ¶ 138.  The attachment in Lickteig's email was a Bourne Partners-prepared document purporting to show trading multiples for various publicly traded pharmaceutical companies.  Defs.' 56.1 ¶ 139.  Mitchell called Lickteig later that day.  Pl.'s 56.1 ¶ 240.  Mitchell explained to Lickteig that the 2013 Adjusted EBITDA in the Lickteig Valuation referred to "EBITDA with various one time items removed to show the sustainable run rate for the business."  Pl.'s 56.1 ¶ 242.  Mitchell did not mention to Lickteig the Collins Valuation or any of the descriptions of Adjusted EBITDA included in the Collins Valuation.  Pl.'s 56.1 ¶ 244.

Also on July 14, 2014, Covis CEO Porter emailed Bourne, regarding the Lickteig Valuation, writing "I told [Cerberus] let me buy out their shares at the valuations I heard."  Pl.'s 56.1 ¶ 245. This suggested that Porter believed the Lickteig Valuation was low.  That same day, Lickteig emailed Bourne to ask if he had some time to speak.  Pl.'s 56.1 ¶ 233.  Bourne forwarded the email to Mitchell and asked whether it was ok to contact Lickteig.  Pl.'s 56.1 ¶ 234.  Mitchell wrote to Bourne:  "He may ask you about appropriate multiples for Covis as we are still having that discussion.  It's all cordial, but should probably not talk up the valuation!"  Pl.'s 56.1 ¶ 235.  Bourne responded:  "Don't worry about that!!!"  Pl.'s 56.1 ¶ 236.  Mitchell responded that "I know you are such an enthusiast!"  Pl.'s 56.1 ¶ 237.  Thus, while Lickteig was considering the Lickteig Valuation, Covis's CEO and members of its board appear to have been discussing how the Lickteig Valuation was low, and how Lickteig should be kept unaware of potentially higher valuations.

On July 22, 2014, Lickteig emailed Mitchell that he would agree to the offer to repurchase his equity interests for $1.3 million based on the earlier email and phone conversation between Lickteig and Mitchell.  Pl.'s 56.1 ¶ 247.  Lickteig believed at the time that the Lickteig Valuation reflected a good faith determination of the fair market value of his equity interests.  Pl.'s 56.1 ¶ 229. Lickteig asked Mitchell to send the necessary paperwork to memorialize the agreement.  Pl.'s 56.1 ¶ 248.  Mitchell emailed Lickteig an execution copy of the agreement to purchase his equity interests on July 31, 2014.  Pl.'s 56.1 ¶ 278.  Lickteig executed the agreement on August 11, 2014.  Pl.'s 56.1 ¶ 281.  The agreement became effective on August 19, 2014.  Pl.'s 56.1 ¶ 283.

K.  July 2014 Financial Results

At the Q2 214 Covis board meeting, held on July 29, 2014 (after Lickteig had agreed to sell his shares but before he executed the agreement), Covis reforecast its 2014 Adjusted EBITDA from 76.8 million to 98.9 million.  Pl.'s 56.1 ¶ 272.  Covis management also represented to the board that the 2014 "6+6" Run Rate EBITDA was $98.1 million.  Pl.'s 56.1 ¶ 274.

L.  Impax Negotiation

Concurrent with the negotiations to purchase Lickteig's Profits Interests, Defendants were negotiating a potential sale of Covis.  On June 6, 2014, Jeffrey Ammerman, an investment banker from Piper Jaffray (n/k/a Piper Sandler), informed Cerberus that his client, Impax Laboratories, Inc. ("Impax"), was potentially interested in acquiring Covis.  Defs.' 56.1 ¶ 152.  On June 18, 2014, a Cerberus employee circulated an "illustrative analysis of Impax buying Covis" that analyzed whether Impax could pay between $850 and $1 billion for Covis.  Pl.'s 56.1 ¶ 252.  The analysis noted a potential "$1.0 billion Covis valuation."  Seifert Decl., Ex. P.  On June 24, 2014, the June 18, 2014 analysis was sent to Mitchell.  Pl.'s 56.1 ¶ 253.

On June 26, after the Valuation Date but before the creation or transmission of the Lickteig Valuation 2014, Daisy Chen, an employee of Cerberus, sent an email with the subject line

"Information Package for Impax" to, among others, Palmer.  Sadighi Decl., Ex. 52.  The email

attached a presentation titled "Covis Pharma S.à.r.l. Investment Highlights."  Defs.' 56.1 ¶ 154.  The

presentation showed a 2013 adjusted EBITDA of $78.5 million and projected a 2014 adjusted

EBITDA of $76.8 million.  Defs.' 56.1 ¶ 157.  Chen explained that Cerberus "plan[ned] to send [the

presentation] to Impax."  Defs.' 56.1 ¶ 155.

On July 8, 2014, Mitchell and other members of Covis management made a presentation

"with the whole senior team of Impax."  Pl.'s 56.1 ¶ 254.  On July 10, 2014, Mitchell wrote to other

Covis board members that "[t]he bankers came back yesterday and confirmed that they are moving

ahead to prepare an offer which we can expect in the next couple of weeks."  Seifert Decl., Ex. R.

Mitchell further wrote:

> In addition, the CEO of Par contacted Jack yesterday and wants to meet to discuss
> 'the future direction of Covis in light of all the banker chatter'.  Jack will be meeting
> him for dinner on Wednesday evening.  We will adopt the same position that we have
> taken with Akorn and Impax and see if they want to propose anything compelling.
> Interesting times as we see the rush to get inversion deals done, as we anticipated.

Seifert Decl., Ex. R.

By July 22, 2014, Piper Jaffray had created a presentation showing Covis's projected 2014

EBITDA at $98.625 million, the same upwardly revised numbers approved by the Covis board on

July 29, 2014, (Pl.'s 56.1 ¶ 257; Seifert Decl., Ex. Z), meaning that Defendants shared updated

financial information with Impax in real time, (Pl.'s 56.1 ¶ 259).  The Piper Jaffray presentation

contained an initial valuation range for Covis of between $950 million and $1.1 billion.  Pl.'s 56.1 ¶

260.

On July 23, 2014, Jim Lenehan, a Covis board member, wrote to fellow board member Brett

Ingersoll that "When you add par and impax together three m[a]y be an interesting offer coming

quickly . . . .  Also, hopefully negotiations w former mgmt. has [sic] concluded.  I think inversion

fever could make this a quick close."  Pl.'s 56.1 ¶ 263.

On July 25, 2014, Ammerman forwarded a non-binding Indication of Interest ("IOI") from Impax CEO Frederick Wilkinson to Mitchell presenting non-binding terms for a potential acquisition of Covis.  Defs.' 56.1 ¶ 159.  The IOI offered $950 million to acquire Covis, with $300 million contingent on future events, including (1) the successful completion of a future acquisition, and (2) "future financial performance of the Lanoxin franchise[.]"  Defs.' 56.1 ¶ 160.  The remaining $650 million would come in the form of cash and Impax stock.  Defs.' 56.1 ¶ 161.  The entire IOI was contingent on diligence "focus[ing] on (1) sustainability and growth of the Lanoxin franchise, (2) outcome and review of the [contemplated] acquisition and (3) stability of the Company's underlying business."  Defs.' 56.1 ¶ 162.

In an email discussion reacting to the Impax IOI, Mitchell wrote the following to his fellow Covis board members:  "Not quite the 'compelling' offer we had indicated would be required both in terms of total value and structure.  It is, however, consistent with what they signaled in terms of structure and might be a basis for negotiation.  The exclusivity is clearly a non-starter at this valuation."  Seifert Decl., Ex. CC.  Ingersoll replied, writing:  "[t]his undervalues the base business and gives us no value for the tax benefits they receive.  Makes our decision easy."  Pl.'s 56.1 ¶ 265. Mitchell then replied:

> I might remind [Ammerman] about the multiples currently being paid for inversions; 10-12X EBITDA.  Would still prefer to have them make a serious bid which we can play off against Par, but like the idea of sending a strong message that this is completely inadequate to take to the Board.

Seifert Decl., Ex. CC.  Ingersoll replied, writing:

> I'm fine with a comment or two on multiples.  Maybe should also let them know we are revising our numbers up a bit for 2014 . . . . not sure what numbers they've seen for 2014 . . . 11 multiple of 90 million excluding our acquisition pipeline would get my focus.

Pl.'s 56.1 ¶ 266; Seifert Decl., Ex. DD.  Internally at Bourne Partners, Bounre described Impax's offer as "r[i]diculous."  Pl.'s 56.1 ¶ 267.  In a separate email, Bourne wrote to Mitchell that "[w]e

clearly told them nothing less than a billion for the base today business."  Pl.'s 56.1 ¶ 270.  Bourne

circulated a summary of inversion transactions showing a mean 14.2x multiple for LTM EBITDA

and a mean 13.7x multiple for the next twelve months.  Pl.'s 56.1 ¶ 271.

Mitchell spoke with Impax's CEO, Wilkinson, and told him that Covis would not pursue a

transaction unless Impax offered $1 billion up front.  Defs.' 56.1 ¶ 165.  On July 30, 2014, Mitchell

wrote to the other Covis board members that he had just gotten off the phone with Impax's CEO

and that "it seems they might be prepared to go to $1 billion."  Pl.'s 56.1 ¶ 276.  Bourne replied:  "If

we get a billion (which we deserve) we might catch this stock at a low point now given the recent

news."  Pl.'s 56.1 ¶ 277.

M.  2014 Sale of Covis

At the October 29, 2014 Board Meeting, Covis management presented a slide which stated

the following:  "Base Business with no commercial and no new Clinicals implied value of

~$1,050mm currently (consistent with Par and Impax offer of 8.-8.5x multiple on current

business)."  Pl.'s 56.1 ¶ 286.  In March 2015, Concordia Healthcare agreed to acquire most of

Covis's assets for $1.2 billion.  Pl.'s 56.1 ¶ 287.

N.  Procedural History

Lickteig filed the initial complaint in this action on June 4, 2019.  Dkt No. 1.  On September

20, 2019, Defendants moved to dismiss for failure to state a claim and for lack of personal

jurisdiction over Mitchell.  Dkt. Nos. 34–36.  The Court granted Defendants' motion as to Mitchell

and granted in part the motion to dismiss for failure to state a claim as to the remaining defendants.

See Lickteig v. Cerberus Cap. Mgmt., L.P., 2020 WL 1989424, at *1 (S.D.N.Y. Apr. 26, 2020).  Lickteig

then moved to amend his complaint, which the Court granted on December 22, 2020.  See Lickteig v.

Cerberus Cap. Mgmt., L.P., 2020 WL 7629876, at *1 (S.D.N.Y. Dec. 22, 2020).  Lickteig filed his

amended complaint the same day.  Dkt. No. 92.

Following discovery, Defendants moved for summary judgment and to preclude the expert testimony of Jeffrey Ammerman and Philip Kanyuk.  Dkt. Nos. 135; 144; 150.  Lickteig filed his oppositions to these motions on September 20, 2021.  Dkt. Nos. 160–162.  And Defendants filed replies on October 11, 2021.  Dkt. Nos. 173; 177; 181.

## II.   MOTION FOR SUMMARY JUDGMENT

Plaintiff's claims in this action relate to alleged misstatements or omissions in the Lickteig Valuation, namely that the estimated 2014 Adjusted EBITDA of Covis was $68.5 million; that the actual 2013 Adjusted EBITDA of Covis was $62.2 million, and that the appropriate EBITDA multiples for the Fair Market Value of Covis were 7.5 times EBITDA in 2013 and 6.8 times EBITDA in 2014.  AC ¶¶ 39, 41, 47, 49.[9]

Ultimately, Defendants' contemporaneous use of different adjusted EBITDAs and adjusted EBITDA multiples in their attempt to sell Covis raise issues of fact regarding whether the numbers in the Lickteig Valuation were false or misleading, even assuming—as Defendants argue—that the adjusted EBITDAs and adjusted EBITDA multiples were statements of opinion.  The use of these separate adjusted EBITDAs and adjusted EBITDA multiples also raises fact issues regarding whether it was misleading to omit from their statements to Lickteig that, while Defendants were representing that a good faith Fair Market Value of Covis was $466.7 million, they were rejecting offers to sell Covis because they were offered less than $1 billion.  Defendants disclaim any falsity in these alleged misstatements and omissions, arguing that the adjusted EBITDAs and adjusted EBITDA multiples in the Lickteig Valuation were sincerely held opinions.  Defendants further argue

---

[9] In their reply brief, Defendants claim that the Court's Order on Defendants' motion to dismiss narrowed Plaintiff's claims to a theory of liability premised on affirmative misstatements rather than omissions that render otherwise true statements misleading.  *See* Defs.' Reply Mem. of L. in Further Supp. of Their Mot. for Summ. J., Dkt. No. 181 ("Reply Br."), at 8–9 (citing *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020 WL 1989424, at *13 (S.D.N.Y. Apr. 26, 2020) (the "Order")).  The Order did no such thing.  Rather, the Order found that Lickteig had adequately pleaded securities violates as to certain statements.  *Id.* at *16.  But it did not purport to limit the theory by which Lickteig could prove those violations.

that Lickteig did not, or should not have, relied on the Lickteig Valuation.  These arguments, however, do little more than ask the Court to resolve factual issues in Defendants' favor.  As such determinations are properly left to the finder of fact, Defendants' motion for summary judgment fails.

      A.  <u>Summary Judgment Legal Standard</u>

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986).  That is to say, Defendants in this case are entitled to summary judgment if they establish that "there is no genuine dispute as to any material fact and that [they are] entitled to judgment as a matter of law." *Id.*  (citing Fed. R. Civ. P. 56(c)).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of showing "the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  If the movant carries that burden, the burden shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Id.* (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  And the non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita*, 475 U.S. at 586.  At summary judgment, the non-movant "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236.  The Court's role is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).  Rather, the Court must decide whether a rational juror could find in favor of the non-moving party.  *Id.*

> B.  <u>Legal Standard for Securities Act Claims</u>

Rule 10b–5, as promulgated under Section 10(b) of the Securities Exchange Act, prohibits the "mak[ing] [of] any untrue statement of a material fact" in connection with the purchase or sale of a security.  17 C.F.R. § 240.10b–5(b).  To maintain a claim under Rule 10b–5, "a plaintiff must prove (1) a material misstatement or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).[10]

---

[10] Lickteig also brings claims for violations of the Iowa Uniform Securities Act IA ST § 502.509(3), which requires proving substantially similar elements to a Section 10(b) claim except for the element of reliance. *See Doud v. Toy Box Dev. Co.*, 798 F.3d 709, 714–15 (8th Cir. 2015).  Likewise, Lickteig brings claims for control person liability under Section 20 and its Iowa state law equivalent—Iowa Uniform Securities Act IA ST § 502.A7.  As Defendants only arguments for summary judgment as to these claims are dependent on granting summary judgment as to the primary violations, the Court focuses its analysis solely on the elements of the primary violations.

C. Discussion

Here, Defendants argue that they are entitled to summary judgment because, as a matter of law, Plaintiff cannot establish either falsity or reliance using the evidence adduced through discovery. The Court analyzes each of these elements in turn.

i. Falsity

"An allegedly material misstatement must have been false at the time that it was made." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F.Supp.3d 278, 290 (S.D.N.Y. 2014). An omission is actionable under Rule 10b–5 "only when the corporation [was] subject to a duty to disclose the omitted facts." *Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal citation omitted). But such a duty can arise if, absent the omitted information, a statement "would . . . be inaccurate, incomplete, or misleading." *Stratte–McClure*, 776 F.3d at 101 (internal citation and quotation marks omitted); *see also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 160 (S.D.N.Y. 2008) ("[E]ven an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading.").

Additionally, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) (citation omitted). For instance, here, by speaking on Covis's fair market value through the Lickteig Valuation, Defendants were required to speak accurately and completely. *See Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.14 (2d Cir. 2020).

Where an alleged misstatement pertains to an expression of opinion, rather than a statement of fact, however, liability "may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts she supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015)).

Additionally, "*Omnicare* went on to hold that opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* (citing *Omnicare*, 575 U.S. at 194). This is so because "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare*, 575 U.S. at 188.

### 1. 2013 Adjusted EBITDA

Based on the record on this motion, a reasonable jury could find that the 2013 Adjusted EBITDA conveyed in the Lickteig Valuation was false or misleading as a matter of fact.  In the Lickteig Valuation, the 2013 Adjusted EBITDA was stated to be $62.2 million.  This specific number for Covis's 2013 Adjusted EBITDA appears nowhere else in the record except when it was used in the Collins Valuation.  And neither the Lickteig Valuation nor the Collins Valuation describe what adjustments were made in computing this metric.[11]  The Collins Valuation conveyed that Covis's Q4 2013 Adjusted EBITDA was $16.95 million, annualized to $67.813 million, before being adjusted down to arrive at the "Q4-13 Run Rate Adjusted EBITDA" of $62.2 million (Sadihi Decl., Ex. 17), but at least as of January 29, 2014, Covis reported that its Q4 2013 Adjusted EBITDA was $24.20 million, which annualized to $96.8 million, (Sadighi Decl., Ex. 30).  Neither the Collins Valuation or the Lickteig Valuation describe what adjustments were made to Covis's EBITDA, making it unclear whether the two Adjusted EBITDA numbers were reached using separate calculations or if the definition of Adjusted EBIDA used in the two valuations was simply different. Accordingly, the record does not conclusively establish how Defendants reached the 2013 Adjusted EBITDA used in the Lickteig Valuation.  Moreover, elsewhere, in the normal course of business,

---

[11] Defendants contend that Mitchell explained to Plaintiff that the "adjusted EBITDA" referred to "EBITDA with various one time items removed to show what is the sustainable run rate for the business," (Defs.' 56.1 ¶ 140), but that statement does not disclose specifically what adjustments were made.

Defendants computed 2013 Adjusted EBITDAs at $60 million and $78.5 million.  And when the time came to negotiate a potential sale of Covis to Impax, Defendants used a 2013 Adjusted EBITDA of $78.5 million, not $62.2 million.  Defs.' 56.1 ¶ 157.

Because Defendants used different 2013 Adjusted EBITDA numbers in the regular course of business, and because the record does not establish the definition of the 2013 Adjusted EBITDA used in the Lickteig Valuation, material issues of fact exist as to whether this number is accurate as a matter of fact.[12]

Further, a reasonable jury could find that the 2013 Adjusted EBITDA conveyed in the Lickteig Valuation was false or misleading as a matter of opinion.  The definition of adjusted EBITDA used by a company, and whether a company chooses to use different definitions in different contexts, are matters of judgment that may fairly be characterized as opinions.  In this way, the 2013 Adjusted EBITDA used in the Lickteig Valuation could be a statement of opinion insofar as it represented Covis's choice to use a particular definition of adjusted EBITDA.  However, issues of fact still exist as to whether the speaker, Mitchell, held the belief he professed, or if he omitted information that made the statement misleading to a reasonable investor.  *See Tongue*, 816 F.3d at 210.  Here, the contemporaneous use of a higher 2013 Adjusted EBITDA both in board presentations and in negotiations to sell Covis raise doubts regarding Mitchell's belief that the 2013 Adjusted EBITDA used in the Lickteig Valuation was the proper metric to determine Fair Market

---

[12] Defendants argue that adjusted EBITDA is not a statement of fact, but rather a statement of opinion.  Defendants point out, correctly, that adjusted EBITDA is a non-GAAP metric with no singular definition—meaning a company may calculate adjusted EBITDA as it chooses.  But once a company decides on a definition for adjusted EBITDA, it may make a false statement of fact by misstating what the correct number should be under the chosen definition.  For example, if a company's EBITDA was $100 and its definition of adjusted EBITDA required an add back of $10 for a one-time expense, it would be a misstatement of fact to report that adjusted EBITDA as $125.  And using non-GAAP metrics without properly disclosing how the company is computing those metrics may make those metrics misleading as a matter of fact.  *See Ironworkers Local 580 – Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014) ("[i]t is not fraudulent for a reporting entity to calculate metrics that," like EBITDA, "are not defined under GAAP," nor is it fraudulent for the company to "tak[e] (or not tak[e] ) into account whatever factors the reporting entity thinks appropriate–as long as the public is told exactly what the company is doing.").

Value.  Likewise, even if Mitchell sincerely believed in the choice of adjusted EBITDA used for the

Lickteig Valuation, an issue of fact exists as to whether a reasonable investor would find it

misleading to omit that, while Mitchell believed that the 2013 Adjusted EBITDA used in the

Lickteig Valuation was the correct number for Defendants to use when purchasing equity in Covis,

he apparently believed a different (higher) number was appropriate when Defendants were selling

Covis.

## 2.  2014 Adjusted EBITDA

For many of the same reasons, a reasonable jury could find that the 2014 Adjusted EBITDA

conveyed in the Lickteig Valuation was false or misleading as a matter of fact.  The Lickteig

Valuation listed the 2014 Adjusted EBITDA as $68.5 million.  Sadighi Decl., Ex. 34.  In the Collins

Valuation, which used the same $68.5 million Adjusted EBITDA number as the Lickteig Valuation,

the 2014 Adjusted EBITDA was calculated by taking the—undefined—FY 14 AOP Adjusted

EBITDA of $76.8 million and subtracting $8.3 million for a "Lanoxin AG Stocking Order One

Time."[13]  Sadighi Decl., Ex. 17.  But in all other instances where Covis calculated a 2014 Adjusted

EBITDA in the regular course of its business, it used a different number.[14]  For instance, in

Cerberus' March 31, 2014 Mark, 2014 Adjusted EBITDA was reported as $65 million.  Sadighi

Decl., Ex. 39.  And in Covis board presentations in January and April 2014, the board reviewed and

approved a 2014 AOP Adjusted EBITDA of $76.8 million, but never made any reductions for a

Lanoxin AG Stocking Order.  Similarly, when negotiating with Impax, the Covis board used the

$76.8 million 2014 Adjusted EBITDA and made no reductions for a Lanoxin AG Stocking Order.

Defs.' 56.1 ¶ 157.  Accordingly, like the 2013 Adjusted EBITDA in the Lickteig Valuation, the only

---

[13] This disclosure did not appear in the Lickteig Valuation.

[14] Like the 2013 Adjusted EBITDA, it is not clear from the Lickteig Valuation, or from anywhere else in the record on this motion, how Covis defined its various 2014 Adjusted EBITDAs.  Whether Covis in fact had different definitions for 2014 Adjusted EBIDTA or used a consistent definition is a separate issue of fact for the jury.

time the company appears to have used the $68.5 million 2014 Adjusted EBITDA was in valuations seeking to repurchase equity interests in Covis. This rases issues of fact as to whether the 2014 Adjusted EBITDA in the Lickteig Valuation was false a matter of fact—or at least rendered misleading when Defendants failed to disclose what adjustments were made or that they would not use the same 2014 Adjusted EBITDA when attempting to sell the company.

As with the 2013 Adjusted EBITDA used in the Lickteig Valuation, a reasonable jury could find that the 2014 Adjusted EBITDA used in the Lickteig Valuation was a false or misleading statement of opinion—insofar as it represented Covis's choice to use a particular definition of adjusted EBITDA. The contemporaneous use of a higher 2014 Adjusted EBITDAs both in board presentations and in negotiations to sell Covis raises doubts regarding Mitchell's belief that the 2014 Adjusted EBITDA used in the Lickteig Valuation was the proper metric to determine fair market value. Thus, issues of fact exist as to whether Mitchell in fact held the belief he professed or whether he omitted information that made the statement misleading to a reasonable investor. *See Tongue*, 816 F.3d at 210. Likewise, even if Mitchell sincerely believed that the 2014 Adjusted EBITDA reported in the Lickteig Valuation was accurate, an issue of fact still exists as to whether a reasonable investor would find it misleading to omit that Defendants believed that a different version of Covis's 2014 Adjusted EBITDA, which resulted in a larger number, was appropriate when selling their own interests in Covis.

Additionally, issues of fact exist as to whether Defendants knew that Covis was materially exceeding its 2014 AOP EBITDA when it sent Lickteig the Lickteig Valuation. While the Covis board reaffirmed the 2014 AOP EBITDA at their April meeting, Covis sent updated financial information to Impax and Lazard no later than ten days after it sent the Lickteig Valuation.[15]

---

[15] Indeed, Defendants' decision to update Impax raises the question of why they did not update Lickteig. "[A] duty to update opinions and projections may arise if the original opinions or projections have become misleading as the result of intervening events." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

3.  <u>Appropriate EBITDA Multiple</u>

Finally, a reasonable jury could find that the EBITDA multiple conveyed in the Lickteig Valuation was false or misleading.  The Lickteig Valuation showed a "TEV/EBITDA Multiple" of 7.5x in reaching its fair market valuation of $466.7 million for Covis.  The choice of the appropriate EBITDA multiple for valuing a company is a matter of opinion.  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) (holding that "financial valuation models depend so heavily on the discretionary choices of the modeler.").  But here, factual issues exist regarding whether the statement of the appropriate multiple was truly believed, or whether it omitted necessary information as to not make it misleading.

First, the contemporaneous use of higher multiples in the Impax negotiations raises an issue of fact regarding whether the multiple given to Lickteig was truly believed.  Defendants point to the failure of Project Crown as evidence that a higher multiple from a tax inversion transaction was not probable.  Defs.' Br. at 29.  However, several Covis board members were discussing higher multiples for the Impax negotiations based on the tax inversion structure and "anticipated" a "rush to get inversion deals done."  Seifert Decl., Ex. R.  Moreover, the record contains evidence that Covis board members knew that a higher multiple and/or valuation was possible, but wanted to avoid talking up the valuation with Lickteig.  See Pl.'s 56.1 ¶¶ 235–37.  Defendants emphasize the tentative nature of Impax's offer.  *See* Defs.' Br., at 30 n.6.  But this ignores that Defendants rejected Impax's potential $950 million offer because Defendants "clearly told [Impax] nothing less than a billion for the base today business."  Pl.'s 56.1 ¶ 270.  Accordingly, based on this record, a reasonable jury could conclude that it was misleading to omit to Lickteig that if Defendants were selling their interests in Covis, they would not accept a valuation less than $1 billion "for the base today business."

Second, the multiple for Lickteig was based on a selection of either a 0%, 25%, or 50% premium with "[n]othing magic in the logic," (Pl.'s 56.1 ¶ 219), and was not based on what the Covis board would seek from a buyer on the open market—indeed, the Covis board rejected an offer from Impax because it did not value Covis at $1 billion or higher.  Thus, even if truly believed, a material issue of fact exists as to whether these two omissions—that the multiple was selected with "nothing magic in the logic" and did not represent the multiple that the Covis board would seek if it were to sell the company—rendered the multiple conveyed in the Lickteig Valuation materially misleading.

### 4. Cerberus Marks are Not Dispositive of Fair Market Value

Finally, on reply, Defendants argue that the Cerberus Marks conclusively demonstrate Defendants' subjective beliefs as to the Fair Market Value of Covis and dispositively prove actual Fair Market Value.  Reply Br. at 15–16.  But the evidence in the record does not support these conclusions.  Rather, a reasonable jury could conclude (1) that the GAAP-compliant calculation of fair value used for the Marks differed from the Fair Market Value of Covis; (2) that Cerberus purposefully set the Marks below Fair Market Value in order to "smooth out" its financial results for investors; and (3) that the non-Cerberus Defendants did not view and/or were not aware of the Marks when creating the Lickteig Valuation.  Even accepting that the Marks may represent some evidence of Fair Market Value, and/or some evidence of certain Defendant's beliefs as to Fair Market Value, that evidence conflicts with other facts in the record discussed above.  And where the record contains competing facts, it is up to the jury, not the Court, to resolve those inconsistencies.

In sum, the record on Defendants' motion for summary judgment evidences quintessential jury questions regarding falsity, namely, whether the statements in the Lickteig Valuation and the omission of the ongoing Impax negotiations, in context, were false or misleading.  "Some statements, although literally accurate, can become, through their context and manner of

presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.") (internal citation and quotation marks omitted).

### ii. Reliance

Similarly, a reasonable jury could find that Lickteig reasonably relied on the Lickteig Valuation. "Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock— based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). Here, Lickteig sent a contemporaneous email to Mitchell that he would agree to sell his Profits Interests for $1.3 million based on the Lickteig Valuation and phone conversation between Lickteig and Mitchell. Sadighi Decl., Ex. 36. A jury could reasonably interpret this as reliance on the statements in the Lickteig Valuation.

Defendants argue that Lickteig's inability to articulate, at his deposition, what he would have done differently had Defendants disclosed the higher valuation shows a lack of reliance as a matter of law. *See* Defs.' Br. at 32 ("in his deposition testimony under oath, Plaintiff could not explain how it would have changed his evaluation of the Lickteig Valuation if the 2014 adjusted EBITDA number was greater than $68.5 million."). But there is no legal basis for this proposition. And to the extent this testimony is relevant to disprove reliance, it must be weighed against Lickteig's contemporaneous email at trial by the finder of fact—not by the Court on this motion.

A jury could also determine that Lickteig's reliance was reasonable. "[A] plaintiff's reliance on the defendant's misrepresentation must have been reasonable in order for the claim to proceed." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337–38 (2d Cir. 2011) (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996) (collecting cases from other circuits)). "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Id.* (quoting *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993)) (quotation marks omitted). In analyzing whether reliance is reasonable, courts should consider

> (1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.* (citing *Brown*, 991 F.2d at 1032).

Here, Mitchell assured Lickteig that 7.5x was the appropriate EBITDA multiple. Pl.'s 56.1 ¶ 141. And determining whether it was still reasonable to rely in Mitchell's assurances is a classic factual determination that would be inappropriate for the Court to resolve in this motion. Defendants argue that Lickteig's reliance was unreasonable, at least as to the applicable EBITDA multiple, because Lickteig was in possession of a document showing the multiples for potentially comparable transactions. Defs.' Br. at 32–34. But a finder of fact could reasonably find that Lickteig's reliance was still reasonable, especially given Mitchell's assurances that the multiple was correct. Mitchell, and the Defendants, were in a unique position to determine an appropriate multiple and in fact were seeking a greater multiple at the same time as assuring Lickteig that the lower multiple was appropriate.

Accordingly, Defendants are not entitled to summary judgment.

## III.     MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A.  Legal Standard

#### i.  FRE 702 Generally

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides

the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:  (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the facts
> of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharm's, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that

Rule 702 requires district courts to act as gatekeepers—ensuring that expert testimony "both rests

on a reliable foundation and is relevant to the task at hand." *Id.* at 597.  As such, the Court must

make "a preliminary assessment of whether the reasoning or methodology underlying the testimony

is scientifically valid and of whether that reasoning or methodology properly can be applied to the

facts in issue." *Id.* at 592–93.  In short, the Court must "make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

#### ii.  Qualification as Expert

"Rule 702 requires a trial court to make an initial determination as to whether the proposed

witness qualifies as an expert." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352–53 (S.D.N.Y.

2003).  "Courts within the Second Circuit 'have liberally construed expert qualification requirements'

when determining if a witness can be considered an expert." *Cary Oil Co. v. MG Refin. & Mktg., Inc.*,

2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (quoting *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)); *accord Plew v. Ltd. Brands, Inc.*, 2012 WL 379933, at *4 (S.D.N.Y. Feb. 6, 2012). "To determine whether a witness qualifies as an expert, the court must first ascertain whether the proffered expert has the educational background or training in a relevant field." *Crown Cork & Seal Co., Inc. Master Ret. Tr. v. Credit Suisse First Boston Corp.*, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013) (citation and internal quotation marks omitted). "Any one of the qualities listed in Rule 702—knowledge, skill, experience, training, or education—may be sufficient to qualify a witness as an expert." *Id.* (citing *Tiffany (N.J.) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007)).

Even if a proposed expert lacks formal training in a given area, he may still have "practical experience" or "specialized knowledge" qualifying him to give opinion testimony under Rule 702. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (internal quotation marks omitted) (quoting Fed. R. Evid. 702). But "[i]f the witness is relying solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 advisory committee s note). Where a witness's "expertise is too general or too deficient," the Court "may properly conclude that [he is] insufficiently qualified." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

A court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004) (citing *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)). "The expert's testimony must be related to those issues or subjects within his or her area of expertise." *Crown Cork*, 2013 WL 978980, at *2 (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp.

2d 558, 642 (S.D.N.Y. 2007)). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl*, 117 F.3d at 80). "Thus, an expert 'should not be required to satisfy an overly narrow test of his own qualifications,' and the court's focus should be on 'whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'" *Crown Cork*, 2013 WL 978980, at *2 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006)). "Assertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'" *Zyprexa Prods.*, 489 F. Supp. 2d at 282 (quoting *McCullock*, 61 F.3d at 1044).

### iii.   Expert Testimony Must Assist the Trier of Fact

To be admissible, a district court must conclude that proposed testimony will assist the trier of fact. *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *see also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.").

"Weighing whether the expert testimony assists the trier of fact goes primarily to relevance." *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (citing *Daubert*, 509 U.S. at 591). Relevance can be expressed as a question of "fit"—"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual

dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)).  Expert testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).  Expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help" should not be admitted.  *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

iv.   Expert Testimony Must Be Reliable

In assessing reliability, courts should consider "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citing Fed. R. Evid. 702).

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267.  If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony "where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013).  "[T]he reliability inquiry may . . . focus upon personal knowledge and experience of the expert." *Id.*

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266.

34

But as the Supreme Court has explained, "conclusions and methodology are not entirely distinct from one another," and a district court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).  "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.  On the other hand, "[w]here an expert's methodology overcomes the hurdle of being based on a reliable process, remaining controversies as to the expert's methods and conclusions generally bear on the weight and credibility—but not admissibility—of the testimony." *Royal & Sun All. Ins. PLC v. UPS Supply Chain Sols., Inc.*, 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011) (citation omitted).

In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267).  Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. *Kumho Tire*, 526 U.S. at 153. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements under Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n.10).

If, at the end of the Court's evaluation of these factors, "'some, but not all, of an expert's opinions . . . meet the criteria' of Rule 702 of the Federal Rules of Evidence, then 'a court may exclude portions of an expert report while admitting other portions.'" *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 394 (S.D.N.Y. 2018) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 76 (S.D.N.Y. 2015)).

Testimony that is admissible under Rule 702 may be excluded under Federal Rule of Evidence 403 if the court finds that "the probative value of the evidence is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Expert testimony is particularly susceptible to these dangers, "given to the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than lay witnesses." *Daubert*, 509 U.S. at 595 (quotations omitted).

### B.  Motion to Exclude Proposed Testimony of Philip Kanyuk

Defendants move to exclude the proposed expert testimony of Philip Kanyuk.  Defs.' Mem. of L. in Supp. of Their Mot. to Exclude the Proffered Expert Testimony of Philip H. Kanyuk ("Kanyuk Br."), Dkt. No. 153.  Plaintiff retained Kanyuk to opine on the fair market value of Lickteig's Profits Interests.  Decl. of Jennifer A. Randolf in Supp. of Defs.' Mot. to Exclude the Proffered Expert Testimony of Philip H. Kanuk ("Randolf Decl."), Dkt. No. 152, Ex. 33 ("Kanyuk Rep.").

i.   Qualifications as an Expert Witness

Defendants do not challenge Kanyuk's qualifications as an expert.  Regardless, the Court has

considered Kanyuk's qualifications as part of its gatekeeping function and determines that he is

qualified to testify as an expert.

ii.   Reliable Principles and Methods

Kanyuk performed his valuation in conformity with the "Statement of Standards for

Valuation Services No. 1" ("SSVS") of the American Institute of Certified Public Accountants

("AICPA").  Kanyuk Rep., at 1.  Kanyuk applied three standard valuation methodologies identified

by the AICPA—the income approach, the asset approach, and the market approach—to reach an

opinion regarding Covis's fair market value.  Kanyuk Rep., at 19.  Other courts have recognized

industry standard methodologies promulgated by the AICPA as valid for *Daubert* purposes.  *See, e.g.,*

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 327 (S.D.N.Y. 2015) (expert testimony admissible

because it conformed with the "accounting standards promulgated by the AICPA"); *United States v.*

*Forbes*, 2006 WL 2792883, at *1 (D. Conn. Sept. 28, 2006) (allowing use of expert methodology in

compliance with AICPA consulting standards).  This Court agrees.  Because an expert opinion is

admissible if it "rests on well-established industry standards," *United States v. Romano,* 794 F.3d 317,

332 (2d Cir. 2015), and because Kanyuk applied such industry-standard valuation methodologies, his

proposed testimony satisfies *Daubert* and is admissible.

Defendants do not contest a valuation made in conformity with the SSVS could satisfy

*Daubert*.  Instead, Defendants argue that Kanyuk's valuation is unreliable *as applied* because Kanyuk

used unreliable financial information, incorrect comparable multiples for Covis, and financial data

that post-dates the Valuation Date.  Kanyuk's use of this purportedly unreliable evidence, however,

does not lead the Court to conclude that Kanyuk's methods were unreliable.  In applying his

methodology, Kanyuk relied on management financial projections and financial data.  As discussed

below, this data is presumptively reliable.  Thus, the choice to rely on this data did not result in an improper process or method as applied.

Kanyuk's expert opinion relied on "management's projections of earnings" taken from the Q2 2014 Covis board meeting on July 29, 2014.  Randolf Decl., Ex. 21.  Courts outside this district consider such projections, made in the ordinary course of business, presumptively reliable.  *See In re: IH 1, Inc.*, 2015 WL 5679724, at *2 (D. Del. Sept. 25, 2015) ("When management projections are made in the ordinary course of business, they are generally deemed reliable."); *Longpath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *10 (Del. Ch. June 30, 2015) (Contemporaneous "projections are useful in appraisals, because they by definition, are not tainted by post-merger hindsight and are usually created by an impartial body.").  This Court sees no reason not to adopt the same principle here.  At trial, Defendants are free to attack the credibility of their own financial projections if they so choose.  But absent some evidence of unreliability, Kanyuk's use of management projections is presumptively appropriate, and his methodology sound as applied.

Nor does the fact that Kayuk used information that post-dated the Valuation Date call into question the reliability of his methods.  "Generally, the valuation analyst should consider only circumstances existing at the valuation date and events occurring up to the valuation date . . . . events . . . occurring subsequent to that date, are not relevant to the value determined as of that date."  AICPA SSVS VS 100.43.  "An event that could affect the value may occur subsequent to the valuation date; such an occurrence is referred to as a subsequent event."  *Id.*  The events referred to in the standard are events that would affect value, not events that evidence that value.  Accordingly, it was consistent with Kanyuk's chosen methodology to consider financial information created after the Valuation Date that would evidence the fair market value on the Valuation Date.  If Defendants believe that internal projections and reports of historical financial performance effected the Fair Market Value of Covis, they are free to pursue such arguments while cross-examining the witness.

38

Finally, Kanyuk relied on sufficient facts and data.  In forming his expert opinion, Kanyuk used Covis's financial projections based upon financial data through June 30, 2014.  He also reviewed, among other things, Covis's Consolidated Balance Sheets as of December 31, 2014 and 2013, the Covis board presentations for the first and second quarters of 2014, and the Cerberus Mark for June 30, 2014.  There is nothing to indicate that these documents were not sufficient to allow Kanyuk to conduct a fair market valuation of Covis.  And Defendants do not argue that Kanyuk's opinion "is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).  Rather, Defendants believe that Kanyuk should have considered other evidence of Covis' valuation, including management's testimony for this litigation, and that the failure to consider, and credit, such evidence makes Kanyuk's opinion incorrect.[16]  *See* Kanyuk Br. at 8–17.  But the AICPA valuation method used by Kanyuck required him to analyze only numbers, not management's testimony.  At bottom, Defendants' argument is that Kanyuk's methodology is unreliable as applied because Kanyuk's conclusion is factually incorrect.  But such factual disagreements are to be resolved by the trier of fact as a matter of weight, not by the Court as a matter of admissibility.

### iii.   Helpful to the Trier of Fact

Finally, Kanyuk's proposed testimony will assist the trier of fact.  If Plaintiff is successful in proving liability in this case, he will be required to show damages.  And because Kanyuk's proposed testimony would aid the trier of fact in determining fair market value, it is admissible.  Defendants' argument that Kanyuk's expert testimony would not assist the trier of fact unless it analyzes whether the Covis board followed the proper contractual requirements, including acting in good faith,

---

[16] Defendants also contend that Kanyuk's method is unreliable as applied because he "improperly relied on guideline companies that were not comparable, ignored Covis's own acquisitions, and ignored management's contemporaneously recorded beliefs as to appropriate multiples."  Kanyuk Br. at 19.  But this argument essentially boils down to a disagreement over Kanyuk's conclusion, not his methodology.  Accordingly, there is no basis to exclude Kanyuk's proposed testimony for failing to apply reliable principles and methods.

essentially asks Kanyuk to reach an impermissible legal conclusion. It is in fact more helpful to the trier of fact for Kanyuk to opine on fair market value, a topic beyond the understanding of a lay person, rather than attempt to usurp the role of the fact finder by opining on whether Defendants acted in good faith.

      C.   Motion to Exclude Proposed Testimony of Jeffrey Ammerman

Finally, Defendants move to exclude the proposed expert testimony of Jeffrey Ammerman. Defs.' Mem. of L. in Supp. of Their Mot. to Exclude the Proffered Expert Testimony of Jeffrey Ammerman ("Ammerman Br."), Dkt. No. 147. Plaintiff designated Ammerman as an expert, without his knowledge or consent, because Plaintiff believes that Ammerman's analysis of Covis for Impax, which resulted in Impax's IOI for $950 million, is evidence of both the falsity of Covis's representations in the Lickteig Valuation as well as damages. Mem. of L. in Opp'n to Defs.' Mot. to Exclude the Proffered Expert Testimony of Jeffrey Ammerman ("Ammerman Opp'n"), Dkt. No. 167, at 1.

      i.   Qualifications as an Expert Witness

The Court finds, and Defendants do not contest, that Ammerman is qualified to testify as an expert. Ammerman is a managing director at Piper Sandler in the healthcare investment banking group. Ammerman has more than 20 years of investment banking experience.

      ii.   Reliable Principles and Methods

The Court next finds that Ammerman applied a reliable methodology in reaching his conclusion. Ammerman conducted preliminary valuation work for Piper Sandler to provide his "client with an initial indicative valuation range for an approach to Covis." Decl. of Frank T.M. Catalina in Supp. of Defs.' Mot. to Exclude the Proffered Expert Testimony of Jeffrey Ammerman ("Catalina Decl."), Dkt. No. 148, Ex. 9. Ammerman undertook this valuation in the ordinary course of his work using his typical method. Ammerman relied upon financials provided by Covis

management, including the 2013 Adjusted EBITDA of $78.5 million and a 6+6 reforecast Projected 2014 Adjusted EBITDA of $98.6 million.  Additionally, Ammerman analyzed comparable twelve comparable publicly traded companies and seventeen specialty pharmaceutical precedent M&A transactions to determine that the appliable EBITDA multiple ranged from 10x to 12x.  On July 25, 2014, based on Ammerman's analysis, Impax issued an Indication of Interest Letter, offering to acquire Covis for $950 million.  Thus, Ammerman completed this initial valuation work consistent with normal practices in the industry, and his methods are admissible under *Daubert*.

Next, Ammerman's analysis was based sufficient facts and data.  In creating his analysis, Ammerman relied on management projections sent by Covis.  As discussed previously, such projections are presumptively reliable.  And nothing in Ammerman's testimony indicates that he lacked the documentation necessary to conduct this preliminary valuation or treated his analysis of Covis different from similar preliminary buy-side valuations.

Likewise, Ammerman properly used his expert judgment in selecting comparable transactions in order to determine an EBITDA multiple.  In conducting his analysis, Ammerman applied "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *Kumho*, 526 U.S. at 152, at least as to preliminary valuation work.  Ammerman used information that Covis, as a potential seller, provided, and based on that information, provided his client with advice as to what might be a reasonable range for a bid from which a buy-sell discussion or negotiation might commence.  *See* Catalina Decl., Ex. 9.

Defendants' arguments that Ammerman should have considered additional information or applied a different method for determining comparable transactions do not establish that Ammerman did not apply a reliable method for making a preliminary valuation.  Rather, these arguments go to the weight of such testimony—specifically, arguments highlight the differences

between a preliminary valuation and a full, formal fair market valuation (as Ammerman himself testified).

### iii.   Helpful to the Trier of Fact

Finally, Ammerman's proposed expert testimony may assist the trier of fact in determining both liability and damages.  While Ammerman's preliminary valuation is subject to significant limitations—many pointed out by Ammerman—it is probative to whether Defendants made false statements to Lickteig—*i.e.* based on the information Defendants chose to send to a prospective buyer, that buyer made a preliminary determination that Covis could be worth $950 million.

Defendants argue that Ammerman's proposed testimony does not evidence a fair market valuation of Covis—resulting in testimony that will not assist the trier of fact.  At his expert deposition, Ammerman agreed with this sentiment, testifying that if he were to undertake a fair market valuation of Covis, he would engage in greater diligence and require more documentation. However, Defendants' argument attacks a strawman.  No one—not Plaintiff, Defendants, or Ammerman—contends that Ammerman conducted a full fair market valuation of Covis.  Instead, Ammerman, in the regular course of business, conducted a preliminary buy-side valuation of Covis—subject to further diligence if Impax and Covis decided to proceed with a transaction. Because Ammerman's testimony would be help explain the context of this preliminary valuation— including its limitations—to the finder of fact, Ammerman's proposed expert testimony is admissible.

### iv.   Admissible Under FRE 403

While Ammerman's expert testimony is otherwise admissible under *Daubert*, it may be excluded under Federal Rule of Evidence 403 if the court finds that "the probative value of the evidence is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed.

R. Evid. 403.  Here, a question exists as to whether testimony regarding a preliminary valuation analysis would confuse the jury such that it might conflate that analysis with a full fair market valuation.  This is a valid concern, as highlighted by none other than Ammerman at his deposition.  However, testimony regarding context in which Ammerman reached the preliminary $950 million valuation that Impax ultimately sent to Covis in the IOI would more likely prevent, rather than create, such confusion.  Indeed, were the jury to simply learn that Impax made an IOI for $950 million, without understanding the limited nature of Ammerman's work, they might simply assume that a more fulsome analysis occurred.  Accordingly, Rule 403 will not bar Ammerman's proposed testimony.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motions are denied.  The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 135, 144, and 150.

SO ORDERED.

Dated:  March 7, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge